AMANDA ACQUISITION
CORPORATION,
Plaintiff,

v.

UNIVERSAL FOODS CORPORATION, Alan R. Anderson, Michael E. Batten, Dr. Olan D. Forker, Dr. Carol I. Waslien Ghazaii, Leon T. Kendall, Paul L. Kohnstamm, Charles S. McNeer, Orville R. Mertz, John L. Murray, Dr. Bernard S. Schweigert, Guy A. Osborn, Gerard E. Veneman, and Darrell E. Wilde, Defendants.

UNIVERSAL FOODS CORPORATION,
Counterclaim Plaintiff,

v.

AMANDA ACQUISITION CORPORATION, Counterclaim Defendant,

and

High Voltage Engineering Corporation, Hyde Park Partners, L.P., Hyde Park Holdings, Inc., Laurence S. Levy, Clifford Press, Oxbridge Capital Corporation, Berisford Capital Corporation, and S. & W. Berisford PLC, Additional Counterclaim Defendants.

No. 88–C–1296.

United States District Court,
E.D. Wisconsin.

March 18, 1989.

William H. Levit, Jr., Michael B. Apfeld, Godfrey & Kahn, Milwaukee, Wis., Gregory P. Joseph, Stephen Lew, Fried, Frank, Harris, Shriver & Jacobson, New York City, for plaintiff and counterclaim defendants, Amanda Acquisition Corp. High Voltage Engineering Corp. Hyde Park Partners, L.P., Hyde Park Holdings, Inc., Laurence S. Levy and Clifford Press.

David E. Beckwith, John R. Dawson, Foley & Lardner, Milwaukee, Wis., Michael W. Schwartz, Peter C. Hein, Wachtell, Lipton, Rosen & Katz, New York City, for defendants and counterclaim plaintiff.

Richard P. Carr, Mary E. Triggiano–Hunt, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, Wis., Jonathan I. Blackman, Jessica Sporn Tavakoli, Michael R. Chayet, Cleary, Gottlieb, Steen & Hamilton, New York City, for counterclaim defendants, Oxbridge Capital Corp., Berisford Capital Corp. and S. & W. Berisford PLC.

Donald J. Hanaway, Atty. Gen., and Daniel D. Stier, Asst. Atty. Gen., Madison, Wis., for intervenor State of Wis.

## DECISION AND ORDER

STADTMUELLER, District Judge.

This matter is before the court on four separate motions each of which seeks preliminary injunctive relief. These motions, three of which were filed by the plaintiff

and one of which was filed by the defendants, include

1. plaintiff's motion to enjoin operation of the defendants' shareholders rights plan (the poison pill);

2. plaintiff's motion for injunctive relief declaring Wisconsin's Business Combination Act, Wis.Stat. § 180.726, unconstitutional;

3. plaintiff's motion for injunctive relief regarding defendants' alleged Federal securities laws claims; and

4. defendant/counterclaim plaintiff's motion to enjoin plaintiff's tender offer on account of alleged violations of Federal securities laws as well as alleged violations of the margin rules promulgated by the Federal Reserve Board.

Following expedited discovery and briefing the issues, a two-day evidentiary hearing was held in conjunction with these motions on February 2 and 3 of this year.

At the outset I wish to commend the parties and their counsel for the thoroughness in their presentations to the court, considering the severe time constraints under which voluminous documents were reviewed, witnesses deposed, and legal authorities presented in support of their respective positions.[1] Following a review of the parties' submissions, I am now ready to render my decision on each of the four motions.

Plaintiff's claims arise under the United States Constitution and §§ 14(d), 14(e) and 28 of the Exchange Act, (the Exchange Act) 15 U.S.C. §§ 78n(e) and 78bb, and the rules and regulations promulgated thereunder. Defendant's counterclaims arise under §§ 7, 14(d), 14(e), 27 and 28 of the Exchange Act, 15 U.S.C. §§ 78(g), 78n(d), 78n(e), 78aa and 78bb, and the rules and regulations promulgated thereunder. Jurisdiction is conferred on this court under § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337, and the doctrine of pendent jurisdiction.

## I. FACTS

The parties have agreed to a limited number of facts in this case. The remainder of the facts are derived from the testimony at the hearing, the exhibits, affidavits, and deposition transcripts which have been filed with the court.

### A. The Parties

Plaintiff Amanda Acquisition Corporation (Amanda) is a Delaware corporation with its principal executive offices in Burlington, Massachusetts. It was formed on November 23, 1988 for the purpose of acquiring defendant Universal Foods Corporation (Universal, Universal Foods, or the Company) and is not engaged in any other business. Amanda is a wholly owned subsidiary of counterclaim defendant High Voltage Engineering Corporation (HVE), a Massachusetts corporation with its principal executive offices also located in Burlington, Massachusetts. HVE was purchased in a hostile tender offer in early 1988 by counterclaim defendant Hyde Park Partners, L.P. (Hyde Park).

Hyde Park is a Delaware limited partnership, 50 percent of which is owned by defendant Hyde Park Holdings, Inc. (Holdings), a New York corporation, and affiliates controlled by defendants Laurence S. Levy and Clifford Press. The remaining 50 percent interest is owned by additional counterclaim defendant Oxbridge Capital Corporation (Oxbridge), a Delaware corporation and a wholly owned subsidiary of another additional counterclaim defendant, Berisford Capital Corporation (Berisford Capital), a New York corporation which is itself an indirect wholly owned subsidiary

---

**1.** One measure of the intensity with which the parties have pursued this litigation may be found in the sheer volume of materials presented to the court for consideration. These materials include the following:

(1) 27 affidavits or declarations totaling hundreds of pages in all;

(2) 23 transcripts of depositions totaling more than 3,400 pages;

(3) 522 exhibits, in all totaling many thousands of pages;

(4) the transcript of the evidentiary hearing which lasted more than 18 hours over two days and produced a transcript of 829 pages; and finally,

(5) more than a dozen briefs and letter memoranda in all totaling 614 pages.

of additional counterclaim defendant S. & W. Berisford PLC (Berisford PLC), an English public limited company.[2]

Holdings is controlled by Messrs. Levy and Press and is the sole general partner of Hyde Park. The business address of Levy and Press is New York, New York. Levy is chairman of the board and secretary of Amanda. He is also chairman of the board and vice president of HVE, and chairman of the board, secretary and treasurer of Holdings. Press serves as president, treasurer and a director of Amanda. He is also deputy chairman of the board and vice president of HVE and president and a director of Holdings.

Defendant and counterclaim plaintiff Universal Foods is a Wisconsin corporation with its principal executive offices located in Milwaukee, Wisconsin. Universal is a diversified manufacturer and marketer of food ingredients and certain consumer food items. Products manufactured by Universal include cheese, yeast, frozen food, dehydrated products, and flavoring and coloring ingredients. Universal Foods' common stock is registered pursuant to § 12 of the Exchange Act, 15 U.S.C. § 78l, and is listed and traded on the New York Stock Exchange and the Pacific Stock Exchange. The market price for Universal's common stock, adjusted for stock splits, was $9.67 per share on September 30, 1984, and rose to $24.00 per share by September 30, 1988.

Defendant Guy A. Osborn became chief executive officer of Universal Foods on October 1, 1988 and has served as president since 1984 and as a director of the company since 1983. Defendant John L. Murray is chairman of the board of Universal Foods and was, until October 1, 1988, chief executive officer of the company. Defendant Darrell E. Wilde is a senior vice president and a director of Universal Foods.

The remaining defendants, Alan R. Anderson, Michael E. Batten, Dr. Olan D. Forker, Dr. Carol I. Waslien Ghazaii, Leon T. Kendall, Paul L. Kohnstamm, Charles S. McNeer, Dr. Bernard S. Schweigert and Gerard E. Veneman are all directors of Universal Foods. Defendant Orville R. Mertz was a director of Universal until he retired on January 26, 1989, after reaching the mandatory retirement age.

Each of the individual defendants, other than Osborn, Murray and Wilde, are non-management and independent directors of Universal. Each is also a business or professional person with either experience in general business matters or special expertise in the particular areas in which Universal transacts business. For instance, Veneman is the retired president of Nekoosa Papers, Inc. Kendall is chairman of the board of the Mortgage Guarantee Insurance Company. McNeer is chairman of the board and chief executive officer of Wisconsin Energy Corporation. Anderson is chairman of the board and chief executive officer of P.A. Bergner and Company. Batten is president and chief executive officer of Twin Disc, Inc. Dr. Forker is a professor in the department of agricultural economics at Cornell University. Dr. Waslien Ghazaii is a professor and program director for the nutrition and food service program at the City University of New York, Hunter College. Kohnstamm is president of General Color Company. Mertz is chairman of Mertz, Inhorn and Associates. Dr. Schweigert is chairman of the department of food science and technology in the college of agriculture and environmental sciences at the University of California, Davis.

B. The Tender Offer

On December 1, 1988 Amanda announced a tender offer to acquire all shares and rights of Universal Foods at a price of $30.50 per share in cash. This offer was communicated to Universal management by way of a phone call from Mr. Press to

2. S. & W. Berisford PLC has recently changed its name to Berisford International PLC. Unless noted otherwise, the term Berisford will collectively refer to Oxbridge, Berisford Capital and Berisford PLC. The interests of these three companies and their relationship to this offer are substantially similar and have been represented throughout the proceedings by their own counsel. When necessary to refer to all counterclaim defendants collectively, I will use the term Acquisition Group.

Mr. Osborn at approximately 3:12 P.M. CST on December 1, 1988. The letter from Press to Universal's management announcing the offer was hand delivered to Osborn about 4:00 P.M. Between these two occurrences this action was filed, at approximately 3:45 P.M. Amanda officially commenced its offer with the filing of its schedule 14D–1 with the Securities and Exchange Commission (SEC) on December 2, 1988.

Amanda's offer was conditioned upon the following:

(a) Seventy five percent of the outstanding shares being tendered by the shareholders;

(b) A final judgment finding the Wisconsin Business Combination Act to be either unconstitutional or inapplicable to the offer;

(c) Redemption of the shareholders rights plan (Rights Plan or Poison Pill)

(d) A declaration of ineffectiveness against Amanda of Article 10 of Universal's restated Articles of Incorporation, the "put" provision;[3] and

(e) Amanda being able to obtain sufficient financing to enable it to purchase all outstanding shares and pay all related fees and expenses.

For purposes of the pending motions only the first three conditions are relevant.

On December 8, 1988 the Universal board of directors voted to recommend that its shareholders reject the offer at the $30.50 price. On December 15, 1988 Amanda announced that it was increasing its offer to $35.00 per share. After a meeting on December 20, 1988 the Universal board voted to recommend that its shareholders reject this revised offer. Amanda had filed its first motion for a preliminary injunction (regarding the statute) on December 14, 1988. A status conference was held with the parties on December 19, 1988, at which the hearing dates of February 2–3, 1989 were established. Shortly thereafter, it was reported in the national press that Amanda was not strenuously pursuing its offer until resolution of the issues before the court. At the time of the February hearing, approximately 17 percent of the outstanding shares of the Universal stock had been tendered or "put into the box" as a result of Amanda's offer. This number includes approximately 3.6 percent of Universal Foods' common stock presently owned by Amanda or its affiliates. As of February 17, 1989, as reported in the New York Times, Amanda and HVE had announced that approximately 27 percent of the shares of Universal have been tendered. Additional facts, as they relate to and have an impact on resolution of the individual motions, shall be stated below.

## II. LEGAL STANDARDS

It must be remembered that each of the motions before the court is a motion for preliminary injunction. When seeking a preliminary injunction, the movant bears the burden of establishing the five requirements necessary for the issuance of the injunction:

(1) That it has no adequate remedy at law;

(2) that it will suffer irreparable harm if the preliminary injunction is not issued;

(3) that the irreparable harm it will suffer if the preliminary injunction is not granted outweighs the irreparable harm the defendant will suffer if the injunction is granted;

(4) that it has a reasonable likelihood of prevailing on the merits; and

(5) that the injunction will not harm the public interest.

*Curtis v. Thompson,* 840 F.2d 1291, 1296 (7th Cir.1988); *Baja Contractors, Inc. v. City of Chicago,* 830 F.2d 667, 675 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988), *citing Manbourne, Inc. v. Conrad,* 796 F.2d 884, 887 (7th Cir.1986). There is persuasive au-

---

**3.** This "put" provision is triggered by a tender offer in which a buyer becomes the owner of more than 50 percent of Universal's common stock or the holder of more than 50 percent of the common stock initiates a tender offer which results in a higher level of ownership. In either event the remaining holders of Universal stock are entitled to "put" their shares to the company at the highest price determined under a number of alternate formulas set forth in the articles.

thority that the movant's demonstration of irreparable injury implies that the remedies at law are inadequate. *See Fleet Wholesale Supply Co., Inc. v. Remington Arms Co., Inc.,* 846 F.2d 1095 (7th Cir.1988).

There can be little question that if either of Amanda's two principal motions relating to the Wisconsin statute and shareholders rights plan were denied, it would suffer irreparable injury. Failure on either of those two motions may well preclude a successful hostile takeover by Amanda since the hurdles posed by the Wisconsin Business Combination Act (the Act, or Wisconsin act) and the shareholders rights plan may well prove insurmountable. However, it is my conclusion that granting the injunction on either of those issues would be equally harmful to Universal. If Amanda succeeds on those issues Universal's defensive measures become nonexistent. If the takeover offer is allowed to proceed on present terms and is successful, it is impossible for Universal to turn the clock back because the company will be sold. Under these circumstances, the balance of the injuries to the respective parties is approximately equal. *See, e.g., Dynamics Corp. of America v. C.T.S. Corp.,* 794 F.2d 250, 252 (7th Cir.1986), *reversed on other grounds, C.T.S. Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). In deciding these two motions, I find that the determining factor in granting or denying the injunction turns on the likelihood of plaintiff's ultimate success on the merits.

As concerns the other two motions, plaintiff's motion regarding the Williams Act violations and defendants' motion regarding Williams Act and margin rules violations, as will be seen below, the balance of harms to the respective parties is not as equal and will play a more determining role in resolution of those two motions.

## III. UNIVERSAL'S MOTION

In its two-part motion, Universal seeks to enjoin the tender offer pending complete compliance with both the margin rules and the Williams Act disclosure requirements. Plaintiff and counterclaim defendants oppose the motion, arguing

(1) that Universal has no standing to litigate margin rule violations;

(2) that Universal's Williams Act claims are without merit; and

(3) in any event, any margin rule or Williams Act violations have been mooted by the January 30, 1989 filing of amendment 13 to Amanda's schedule 14d–1.

Plaintiff and counterclaim defendants contend that this latest amendment does everything which the law requires of them, even if Universal's claims had merit. I will address this motion first because if this motion is successful, the need to resolve the other motions may be moot. However, my review of the materials and legal authorities brought to the court's attention convince me that Universal's motion should be denied.

Defendants' motion raises questions about the financing and control structure of the Amanda offer. Through discovery in this case, it has been determined that the relationships among the Acquisition Group parties are extremely complex. The corporate structure as presented by Universal at the hearing and modified in the testimony of Mr. Press is attached as Appendix B.

The financing is almost as complex. Amanda is contributing $10 million in equity to the total cost of the offer. Press's testimony established that this $10 million contribution could realistically be traced back to Berisford. Berisford Capital is purchasing $110 million in preferred stock in Amanda. The preferred stock has no right of redemption and at present has no stated dividend rate. Amendment 13 to Amanda's Schedule 14D–1 states that the stock will pay such dividends as are declared from time to time by the board of the purchaser (*i.e.* Amanda). The parties anticipate that following the offer, the board of the purchaser will determine a fair and appropriate dividend rate in light of the circumstances of the time.

Additional funds will be provided by Chase Manhattan Bank. Chase will provide up to 50% of the purchase price, which

is to be secured by the stock of Universal. All parties agree that this is a margin loan. (The offer does have an alternative financing structure in the event of a friendly merger. I do not find this relevant, notwithstanding Amanda's experts' contentions to the contrary, because at this juncture this is a hostile takeover and there seems to be little chance of it converting to a friendly merger.) In addition to the Chase loan, Kidder Peabody & Co. will supply financing in the amount of $159 million, which will be senior subordinated debt. Kidder will raise the money by issuing high yield bonds, or "junk bonds." The final amount of money will be provided by Berisford Capital which will supply $75 million in junior subordinated debt. Both the Kidder and Berisford Capital investments are subordinate to the Chase loan.

HVE has guaranteed the loans to both Kidder and Berisford Capital. This, Amanda argues, brings them within one of the safe harbors of the Federal Reserve's margin rules to escape the presumption that these type of loans would be indirectly secured by the stock of the target and so also be a margin loan. In turn, HVE's guarantees are backed by Berisford PLC.

Universal also raises the issue of who is really controlling this offer. Universal contends that Berisford PLC is controlling this offer and Messrs. Levy and Press are just agents or fronts for Berisford PLC. Universal asks that the court enjoin the tender offer and force the Acquisition Group to sit down and prepare a concise, clear and complete tender offer which reflects the relationship of the parties and complies in full with the margin rules, and communicate such offer to the shareholders.

### A. Margin Rules

Both parties rely on *Bassler v. Central National Bank in Chicago*, 715 F.2d 308 (7th Cir.1983), in disputing whether Universal has a right to assert Amanda's violation of the margin requirements as set forth in § 7(d) of the Exchange Act, 15 U.S.C. § 78g(d) and the regulations promulgated thereunder. Amanda finds support for the simple proposition that there is no right of action under the margin rules. Universal claims the holding in *Bassler* is limited to its own facts, and that the court did not consider the possibility of a right of action existing in a target corporation. The discussion in *Bassler* does support Universal's position, as the court only clearly considered application of the rules to individual investors and stated its conclusion in narrow terms: "[T]here is no indication of legislative intent, explicit or implicit, to create a private right of action in individuals in Bassler's position as against lenders in Central's position." *Id.* at 313. Similarly, while other circuits probing the question have denied a private right of action, often in broad terms, they do not appear to have considered the issue of standing vis-a-vis the target corporation. *Bassler*, 715 F.2d at 312 (and sources cited therein).

The guidelines set out in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), *rev'g* 496 F.2d 416 (3d Cir.1974) for determining the existence of a private right of action govern this case. *Cort* outlined four requirements for an implied right of action:

(1) Whether plaintiff belongs to the class for whose "especial benefit" the statute was enacted;

(2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one;

(3) whether implying such a remedy is consistent with the underlying purpose of the legislative scheme; and

(4) whether the cause of action is "traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* 422 U.S. at 78, 95 S.Ct. at 2087.

In *Bassler*, the seventh circuit explicitly recognized that the second of the above four factors—legislative intent—is the key and that the *Cort* mode is but one of several permissible approaches to ascertainment of that intent. *Bassler*, 715 F.2d at 310. Despite the narrow wording of the *Bassler* court's conclusion, its analysis has broader implications, indicating that no congression-

al intent to create a private right of action exists in pertinent legislative history. *Id.* at 311–13. In fact, "[t]he main purpose [of the 1934 act was] to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry...." House Comm. on Interstate and Foreign Commerce, Report on H.R. 9323, H.R.Rep. No. 1383, 73d Cong., 2d Sess. 8 (1934) (quoted in *Bassler,* 715 F.2d 308 (1983)).

The margin regulations provide the government with tools for use in credit regulation. That a target company might incidentally benefit from these regulations does not necessarily create a right in favor of such companies. *Cf. Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 478, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1976) ("As in *Cort v. Ash,* 422 U.S. 66, 80, 95 S.Ct. 2080, 2089, 45 L.Ed.2d 26 (1975), we are reluctant to recognize a cause of action here to serve what is 'at best a subsidiary purpose' of the federal legislation."); *Bassler,* 715 F.2d at 313.

A few courts have found that target companies had a private right of action under § 7. Perhaps the best reasoning toward this end is found in *Pabst Brewing Co. v. Jacobs,* [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,042, 1982 WL 1370 (D.Minn. March 8, 1982). Noting the Exchange Commission's concern for instability in the prices of individual securities, the *Pabst* court reasoned:

> The issuer is clearly a member of the class whom Congress intended to benefit by enactment of the statute. *Cort,* 422 U.S. at 78 [95 S.Ct. at 2087].
>
> The language of § 7, itself, suggests the availability of a private cause of action. In *Touche Ross [v. Redington ],* 442 U.S. [560] at 569 [99 S.Ct. 2479, 2485, 61 L.Ed.2d 82], the Supreme Court refused to find a private right of action because the language of the statute at issue 'neither confers rights on private parties nor proscribes any conduct as unlawful.' In contrast, § 7 expressly

proscribes as unlawful the extension or receipt of credit in contravention of the margin rules....

> Congressional intent to create a private right of action can also be inferred from the "contemporary legal context" in which amendments to the statute were enacted. *Cannon [v. University of Chicago ],* 441 U.S. [677] at 698–99 [99 S.Ct. 1946 at 1958, 60 L.Ed.2d 560]. At the time Congress enacted the 1968 and 1970 amendments to § 7, a number of courts had held that there was an implied right of action under § 7. *See, e.g., Livingston v. Weis, Voisin, Cannon, Inc.,* 294 F.Supp. 676, 681 (D.N.J.1968); *Sezysko [Serzysko] v. Chase Manhattan Bank,* 290 F.Supp. 74 (S.D.N.Y.1958 [1968]), *aff'd per curiam on opinion below,* 409 F.2d 1360 (2d Cir.), *cert. denied,* 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969); *Remar v. Clayton Securities,* 81 F.Supp. 1014 (D.Mass.1949).
>
> The third *Cort* factor also supports implication of a private right under Section 7. The SEC and the Federal Reserve Board have both encouraged courts to imply such a private action as a necessary supplement to the SEC's enforcement efforts. *See, e.g., Palmer v. Thomson & McKinnon, Auchincloss, Inc.,* 427 F.Supp. 915, 917 n. 1 (D.Conn. 1977); *Pargas, Inc. v. Empire Gas Corp.,* 423 F.Supp. [199] at 251–256 (D.Md.1976).

*Id.* at 94,953.

The *Pabst* court's reasoning is persuasive in several respects. I realize that allowing a target company a private right of action under § 7 may well serve as a useful supplement to government enforcement efforts. And Congress, in enacting the statute, undoubtedly had some concern for the instability of individual securities issues. But the statute and regulations are distinctly regulatory, proscribing certain conduct without suggesting a corresponding extension of rights. Of course, the central issue is specific congressional intent. While *Pabst* correctly cites cases for the proposition that an implied right of action existed prior to the 1968 and 1970 amendments, none of these cases consider,

or offer an analogue to, target company or issuer standing. The *Pabst* court implicitly relied on the fact that the 1970 amendments specifically eliminated investor standing, *see Stern v. Merrill Lynch, Pierce, Fenner & Smith,* 603 F.2d 1073 (4th Cir.1979) (citing cases), without eliminating issuer standing. But I find no authority suggesting that any court ever considered that issuer standing might even be possible under the statute prior to the amendments. Rather, it appears that issuers' rights are simply not within the contemplation of the statute.

■ Given the "strict approach" to implying private rights of action required by *Cort,* and the seventh circuit's impliedly "uninhibited" but vain search for intent in *Bassler,* I must conclude there is no private right of action under § 7. *Cf. Pargas, Inc. v. Empire Gas. Corp.,* 423 F.Supp. 199 (1976) (finding standing because issuer has personal stake, is subject to injury from violation, and is arguably within the statute's regulatory zone of interests, or because protection of such parties is supplemental aim of regulations, rather than applying *Cort* standards), *aff'd mem.,* 546 F.2d 25 (4th Cir.). This absence of intent is affirmed by the clear indication that the margin regulations were not created for the "especial benefit" of target companies.

■ Notwithstanding the unavailability of a private right of action under § 7 of the Exchange Act or the regulations promulgated thereunder, a number of courts have found that a target company does have standing to allege failure to disclose margin violations. *See, e.g., Koppers Co., Inc. v. American Express Co.,* 689 F.Supp. 1371, 1397 (W.D.Pa.1988); *Revlon, Inc. v. Pantry Pride, Inc.,* 621 F.Supp. 804, 814 (D.Del.1985) (and sources cited therein). Each of these courts considered the allegations of margin violations as a violation of Williams Act disclosure requirements. The Acquisition Group contends that amendment 13 to Amanda's 14D-1, filed January 30, 1989, discloses the allegations which Universal raises and this is sufficient to meet its legal obligations. *Avnet, Inc. v. Scope Industries,* 499 F.Supp. 1121, 1125 (S.D.N.Y.1980). *See also USG Corp. v. Wagner & Brown,* 689 F.Supp. 1483, 1492–93 (N.D.Ill.1988) (disclosure of a dispute regarding alleged Hart–Scott–Rodino violations, as opposed to violations themselves, sufficient to defeat a motion for a preliminary injunction). I believe that, because I do not reach the issue of whether the margin rules were actually violated, a disclosure of alleged violations, without actually admitting that violations exist, does satisfy Amanda's and the Acquisition Group's legal obligations. However, while the alleged violations will not support enjoining the tender offer (because without standing or a right to challenge the margin financing Universal has no chance of success on the merits), they will play a role in the outcome of this suit.

### B. Williams Act

Universal has also raised what has been termed by the counterclaim defendants as the "bidder" issue. Universal contends that Berisford PLC is the real party controlling this tender offer and that the Acquisition Group has failed to disclose this material information to the company and the shareholders. Again, the counterclaim defendants contend that amendment 13 moots any of Universal's claims because Berisford has done everything which would be required of a bidder. Universal responded, at the hearing, that court acceptance of the Acquisition Group's argument will foster unlawful activity. Universal contends that merely requiring disclosure, without additional sanctions, will lead others to violate the law. The argument continues that parties will violate because at worst all that they will face is the prospect of having to file amendments. Therefore, if they get away with it, well and good; if not, simply correct the matter later.

It is settled that the appropriate remedy for a violation of the Williams Act disclosure requirements is disclosure. *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). Universal asks this court to impose an obligation on the parties to turn back the clock, write a new offer to purchase, and communicate

that to the shareholders. (Amendment 13 was filed with the SEC but not mailed to the shareholders.) Amanda's counsel stated to the court that it would communicate whatever information to the shareholders the court required, but requiring a new offer to purchase was not warranted. Berisford counsel argue that all material information has been disclosed and that information which is not disclosed is immaterial.

The issue of whether Berisford is really the party on behalf of whom the offer is made is a fact specific question. Messrs. Levy and Press testified that they were the persons actually controlling this offer and the Berisford parties were only kept informed of their decisions. Numerous documents have been brought to the court's attention which imply that Berisford has the right to control the terms and conditions (including price) of the offer and would control Universal after the acquisition. Levy and Press both testified that those documents did not control the present offer, but admitted that the documents were used in planning the offer. The documents included such control for Berisford as approving the timing and amount of the offer, appointing a majority of the Universal board, providing management expertise in running Universal (Berisford is in the food industry), and providing the majority of the equity for the investment. Berisford officers have testified that they are involved in this offer solely for investment purposes. All Acquisition Group parties have stated they have a good working relationship and as a matter of courtesy inform the others of what events occur and what future steps are planned, which explains the trip to London by Levy and Press to meet with Berisford people prior to increasing the amount of the offer.

At present, no complete written agreement between Amanda and Berisford exists with respect to the tender offer for Universal. Certain matters are defined. These include Berisford's obligation to indemnify the parties for costs incurred through the back end merger, to pay Levy and Press a specified fee for their services both through the merger and (as a management fee) after the merger, and agreed to guarantee the financing guarantees made by HVE to Kidder, Chase, and Berisford Capital. The lack of a written agreement contrasts sharply with the HVE takeover by Hyde Park in early 1988. Levy, Press and Berisford were also involved in that transaction. In that, the parties operated under a comprehensive document which was termed the Hyde Park I Partnership Agreement. The agreement defined the parties respective roles during the acquisition and after the takeover.

Universal's contentions regarding the alleged violations on this issue relate to the failure on the part of the Acquisition Group to completely reveal the relationship and agreements between the parties making the offer, the failure of Berisford to admit it is the party for whom the offer is made, the failure of the Acquisition Group to reveal the margin rule violations, the failure to reveal that Berisford will have to consolidate the debt from this deal on its own balance sheet, and the failure to reveal that Berisford will have to get shareholder approval for its participation in this offer. All of these contentions have been disclosed by the Acquisition Group in its amendments which have been filed with the SEC. Universal, as noted, wants more disclosure.[4]

Based on the present record, it is not possible to conclusively state that Berisford is a bidder and controlling this offer. Certainly in the broad sense the tender offer for Universal makes more economic and

4. The issue of whether Berisford needs shareholder approval has been recently resolved by the London Stock Exchange. On March 7, 1989 the exchange determined that based on Berisford's contribution of $195 million, which represents 24% of Berisford's assets, no shareholder vote is needed. If the contribution increases to more than 25% of Berisford's assets, a vote by Berisford's shareholders will be required. This information has been included in amended filings with the SEC. The parties have made much of this issue in recent submissions to the court, each side drawing its own inferences. While I find this information interesting, particularly the fact that Berisford may be required to secure shareholder approval under certain conditions, that fact is of no significance in reaching my decision today.

practical sense if Berisford is viewed as the real party in interest. Berisford is a British food company with growth aspirations in the American market. Berisford is allegedly providing massive sums of capital for this investment, with a relatively small return. And Philip Aaronberg, a director of Berisford PLC, stated that at some point in the next few years they may look to Universal with their "own covetous eyes." (After reviewing the transcript, it is difficult to ascertain whether the "they" meant Berisford PLC or Hyde Park, of which Berisford indirectly owns 50%.) Levy and Press are young men with no experience in the industries in which Universal operates. HVE has no product lines in common with those of Universal. HVE is also a small company which just recently was purchased by Hyde Park and has little extra cash flow to invest in an offer of this size.

However, the only factual testimony presented demonstrates that Levy and Press are the controlling parties to this transaction and Berisford PLC and its subsidiaries are participants for investment purposes. The matters raised by Universal are based on its own inferences and conclusions gleaned from documents which involved the prior discussions between Hyde Park, Berisford and Resource Planning, Inc., a nonparty in this suit. No testimony was presented to rebut that of the Acquisition Group witnesses. For the purpose of this motion, I find that Universal has not met its burden of demonstrating a reasonable likelihood of success on the merits to diminish the need to weigh the respective harms to the parties.

■ If the motion is denied, Amanda's offer remains on the table, and Universal is forced to use other means which are in the best interests of the shareholders and the corporation to deal with the offer. If the motion is granted, Amanda must in essence start from scratch and may miss a unique business opportunity, namely the acquisition of Universal. Clearly, the harms weigh in favor of Amanda. In addition, the public could be harmed by granting the injunction. If the offer is enjoined pending a full trial on the merits, the shareholders

may face the prospect of Amanda withdrawing the offer without a substantial likelihood that Universal will succeed in challenging Berisford's role. Therefore, Universal's motion to enjoin the offer pending trial or the Acquisition Group creating a new offer will be denied. As with the alleged margin violations, however, the ambiguities raised by the lack of an agreement, and the prior agreements which the Acquisition Group contends are no longer operable, are relevant to other issues raised by this suit.

## IV. WILLIAMS ACT MOTION

Amanda contends that Universal has violated both sections 14(d)(4) and 14(e) of the Exchange Act, 15 U.S.C. §§ 78n(d)(4) and 78n(e), by making recommendations without complying with the rules and by making untrue statements of material fact. The statutes state in relevant part:

(d)(4) Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent such acts and practices as are fraudulent, deceptive, or manipulative.

The first allegations concern rules 14e-2(a) and 14d-9(a) promulgated by the SEC pur-

suant to § 14(d), 17 C.F.R. §§ 240.14e–2(a) and 240.14d–9(a). Rule 14e–2(a) provides that the target company shall provide within ten days of the tender offer a statement to shareholders which either (a) recommends acceptance or rejection of the tender offer, or (b) expresses no opinion and is remaining neutral to the offer, or (c) is unable to take a position with respect to the offer and the reasons why the target management cannot take a position. Rule 14d–9(a) provides that any recommendation must include information and the reasons for the recommendation.

The statements which Amanda claims are in violation of the rules include

• John Murray's statement on December 1, 1988 in which he told the press that a meeting of the board would be held in due course and he would recommend the board reaffirm its "not for sale" position. (A schedule 14D–9 was filed by Universal with regard to this statement on December 2, 1988.)

• Guy Osborn's statement in the December 2 14D–9 which said that the statement of Murray was not a recommendation of the board. (The SEC sent a letter to Universal which said the press release violated the rules and to file the proper forms. Universal's response to the SEC explaining its position on the matter was not answered.)

• Lack of reasons for the recommendation in the 14D–9 of December 2.

• Statement of Ken Manning, Universal vice president, to the Milwaukee Business Journal for the week of December 5 that Murray planned to recommend rejection of the offer. Amanda claims no 14D–9 was ever filed.

• December 7, 1988 filing of a petition by Universal with the Wisc.Comm.Sec. under Wis.Stat. § 552.05(4) which Amanda contends is another recommendation for which no 14D–9 was filed.

At the hearing, Amanda withdrew all the issues from consideration except the alleged disclosure violation relating to the December 1, 1988 press release. Amanda contends that when Murray recommended rejection of the offer, he was required to provide reasons for that recommendation. Amanda feels it is important that this failure be disclosed to the shareholders because they have a right to know that Murray had, in its opinion, no reason for his opposition to the offer. The other issues were withdrawn due to the complexity of the record before the court.

■■■ First of all, it is debatable whether the press release was a recommendation or a "stop, look and listen" communication to the shareholders. The latter is perfectly within a target's prerogatives without filing a 14D–9. 17 C.F.R. § 240.14d–9(e); *Anaconda Co. v. Crane*, 411 F.Supp. 1210, 1215 (S.D.N.Y.1975). If it was a "stop, look and listen" communication, no reasons need be given. Secondly, I find that if it was a recommendation, it came from management, not the board of directors. Perhaps more importantly, even if it was a recommendation which did not contain reasons, the issue is moot because of the increased offer. Thus, there is no irreparable injury justifying injunctive relief. *See Gulf Corp. v. Mesa Petroleum Co.*, 582 F.Supp. 1110 (D.Del.1984).

Amanda's other allegations concern violations of § 14(e) which involve the matters of misrepresentations. I construe counsel's comments as withdrawing these from the court's consideration as well. Therefore, I need not reach the issue of whether any material misrepresentations were made and whether they would support injunctive relief.

## V. THE WISCONSIN BUSINESS COMBINATION ACT

Amanda's tender offer is conditioned on, among other things, invalidation of Wisconsin's Business Combination Act, Wis.Stat. § 180.726, or Amanda's otherwise being satisfied that the Act is inapplicable to the offer.

Amanda contends that the Act is preempted by the Williams Act, 15 U.S.C. §§ 78m(d) and 78n(d)-(e), and therefore violative of the supremacy clause, art. VI, cl. 2 of the United States Constitution. In addition, Amanda contends the Act violates the commerce clause, art. I, § 8, cl. 3 of the

United States Constitution because it places an excessive burden on interstate commerce. In taking up the question of whether the Act is violative of the Constitution, I note the well-established principle that every duly enacted state law is entitled to the presumption of constitutionality. *See, e.g., Lockport v. Citizens for Community Action,* 430 U.S. 259, 272, 97 S.Ct. 1047, 1056, 51 L.Ed.2d 313 (1977), *motion denied,* 431 U.S. 902, 97 S.Ct. 1692, 52 L.Ed.2d 385.

Because a second-step merger is the purpose of the offer, defendants' reply memorandum at 32, the chief provision in dispute is Wis.Stat. § 180.726(2), which provides:

> Except as provided in sub. (5), a resident domestic corporation may not engage in a business combination with an interested stockholder of the resident domestic corporation for 3 years after the interested stockholder's stock acquisition date unless the board of directors of the resident domestic corporation has approved, before the interested stockholder's stock acquisition date, that business combination or the purchase of stock made by the interested stockholder on that stock acquisition date.

"Business Combination" is defined in § 180.726(1)(e) and includes various forms of self-dealing between an interested stockholder and the corporation. An "interested stockholder" of a resident domestic corporation is a person other than the resident domestic corporation or a subsidiary of the resident domestic corporation who is a) "the beneficial owner of at least 10% of the voting power of the outstanding voting stock of the resident domestic corporation," or b) "an affiliate or associate of that resident domestic corporation and at any time within 3 years immediately before the date in question was the beneficial owner of at least 10% of the then outstanding voting stock of that resident domestic corporation." Wis.Stat. § 180.726(1)(j)1. " 'Stock acquisition date', with respect to any person, means the date that that person first becomes an interested stockholder of that resident domestic corporation." Wis.Stat. § 180.726(1)(n). The Act is set forth, in full, in Appendix A to this opinion. Partic-

ular provisions will be referenced where helpful.

## A. The Williams Act Challenge

■ Amanda contends that the Williams Act preempts the Wisconsin act, making the latter violate the supremacy clause. The Supreme Court's decisions on preemption leave no doubt that "absent an explicit indication by Congress of an intent to preempt state law, a state statute is preempted only" where complying with both federal and state regulations is physically impossible, or where the state law is an obstacle to accomplishing and executing Congress' full purposes and objectives. *C.T.S. Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 107 S.Ct. 1637, 1644, 95 L.Ed.2d 67 (1987) (citations omitted) *rev'g Dynamics Corp. of America v. C.T.S. Corp.,* 637 F.Supp. 389 (N.D.Ill.1986), *aff'd,* 794 F.2d 250 (7th Cir.). Entities can comply with both the Williams Act and the Wisconsin act. Therefore, the Wisconsin act can be preempted only if it frustrates the Williams Act's purposes.

In making both their Williams Act and commerce clause arguments, the parties in this case chiefly rely on *CTS,* 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987), and *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), *aff'g MITE Corp. v. Dixon,* 633 F.2d 486 (7th Cir.1980). In *MITE,* a divided Court struck down on commerce clause grounds an Illinois statute that provided for a twenty-day precommencement period, during which time management could disseminate its views on an upcoming tender offer but offerors could not publish their offer. The statute also provided that the fairness of tender offers would be reviewed by the Illinois secretary of state. A three member plurality found the statute preempted by the Williams Act. In *CTS,* the Court upheld an Indiana statute requiring a majority vote of disinterested shareholders before an entity acquiring controlling shares is entitled to voting rights. The acquiror can require management to hold a shareholder vote within fifty days if the acquiror files the appropriate statement, requests a special

meeting and agrees to pay the expenses of the meeting. The Seventh Circuit Court of Appeals found the statute preempted under the Williams Act based on the view that the law's practical effect was to delay consummation of tender offers until fifty days after their commencement. *CTS*, 107 S.Ct. at 1647. Though both the Illinois and the Indiana statute are distinct from Wisconsin's act, the Court's reasoning is instructional to the present case.

The Williams Act governs disclosure and procedure with respect to tender offers. *See generally CTS*, 107 S.Ct. at 1644 (summarizing structure and purposes of Williams Act). In *MITE*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), as interpreted by the *CTS* Court, the three-member plurality "concluded that the Williams Act struck a careful balance between the interests of offerors and target companies, and that any state statute that 'upset' this balance was preempted." *CTS*, 107 S.Ct. at 1645 (citing *Edgar v. MITE Corp.*, 457 U.S. at 632–634, 102 S.Ct. at 2635–36). The *CTS* Court found its holding to fall within the scope of the *MITE* plurality's analysis, but effectively cast doubt on that analysis in not expressly adopting the plurality's reasoning:

> As the plurality opinion in *MITE* did not represent the views of a majority of the Court, we are not bound by its reasoning. We need not question that reasoning, however, because we believe the Indiana act passes muster even under the broad interpretation of the Williams Act articulated by Justice WHITE in *MITE*.

*CTS*, 107 S.Ct. at 1645. This court need not question the correctness of Justice White in *MITE*, if the present case is governed by the reasoning applied in *CTS*. But a discussion of the Williams Act's purposes is illuminating, particularly given the limited precedential value of the *MITE* plurality's reasoning.

Carefully considering the Williams Act's legislative history in *Piper v. Chris–Craft Industries*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), *reh'g denied, Bangor Punta Corp. v. Chris–Craft Industries, Inc.*, 430 U.S. 976, 97 S.Ct. 1668, 52 L.Ed.2d

371, the Supreme Court concluded "that the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer." *Id.* at 35, 97 S.Ct. at 946. The Court recognized that

> Congress was indeed committed to a policy of neutrality in contests for control, but its policy of even-handedness does not go either to the purpose of the legislation or to whether a private cause of action is implicit in the statute. Neutrality is, rather, but one characteristic of legislation directed toward a different purpose—the protection of investors. Indeed, the statements concerning the need for Congress to maintain a neutral posture in takeover attempts are contained in the section of the Senate Report entitled "Protection of Investors." Taken in their totality, these statements confirm that what Congress had in mind was the protection of shareholders, the "pawn[s] in a form of industrial warfare." The Senate Report expressed the purpose as "plac[ing] investors on an equal footing with the takeover bidder," Senate Report 4, without favoring either the tender offeror or existing management.
>
> \* \* \* \* \* \*
>
> The sponsors of this legislation were plainly sensitive to the suggestion that the measure would favor one side or the other in control contests; however, they made it clear that the legislation was designed solely to get needed information to the investor, the constant focal point of the committee hearings.

*Id.* at 29–31, 97 S.Ct. at 943–44.

 As this passage reflects, any balance of power between bidder and management afforded by the Williams Act is incidental to the legislation's "sole purpose": providing information to shareholders. The Williams Act's policy-neutrality as to bidder and management is properly described as a characteristic rather than a purpose of the statute. The Williams Act responded to takeover bidders who operated covertly to the detriment of shareholders, *see* S.Rep. No. 550, 90th Cong., 1st Sess., 2 (1967); *Piper*, 430 U.S. at 28, 97 S.Ct. at 942, and is concerned with neutrali-

ty between bidder and management insofar as this neutrality protects shareholders' access to necessary information. Any other balance of power between bidder and management must arise from outside this federal law.

The *MITE* plurality's preemption analysis, as ostensibly applied by the *CTS* Court, was summarized in *BNS Inc. v. Koppers Co., Inc.*, 683 F.Supp. 458, 469 (D.Del.1988):

First, does the statute protect independent shareholders from coercion? Second, does the statute give either management or the offeror an advantage in communicating with stockholders? This question may be reformulated to fit the circumstances of the present case by phrasing as whether the statute gives either management or the offeror an advantage in consummating or defeating an offer. Third, does the statute impose an indefinite or unreasonable delay on offers? And fourth, does the statute allow the state government to interpose its views of fairness between willing buyers and sellers?

The latter two questions are of little assistance in the present case. The state does not interpose its views of fairness by virtue of having passed the Act, which itself expresses no view of transactions or invokes the state's power to intercede in a transaction. Any questions of fairness are appropriately considered in terms of management's relative power under the Act. Further, the Act by its terms does not directly impede a tender offer in any respect. It does not address disclosure requirements or prevent a tender offer from going forward. Rather, the statute affects business combinations following a successful tender offer.

The fundamental question implicated by the Williams Act analysis in *CTS* and *MITE* is whether the Wisconsin act impairs shareholder autonomy, providing management with an undue advantage that could hinder the shareholders' exercise of an informed choice concerning the tender offer.

It appears undisputed that the Act was intended to deter hostile tender offers for Wisconsin corporations; and it is reason-ably likely that the statute will have this effect. But the extent of this effect is speculative, and nothing about the Act prohibits any entity from purchasing or offering to purchase shares in Wisconsin corporations, or from attempting thereby to gain control. *Cf. CTS*, 107 S.Ct. at 1652. Considering Indiana's anti-takeover law, the Court stated:

Of course, by regulating tender offers, the act makes them more expensive and thus deters them somewhat, but this type of reasonable regulation does not alter the balance between management and offeror in any significant way. The principle result of the act is.... fully in accord with the purposes of the Williams Act.

*Id.* at 1646 n. 7. The "balance" properly required here is that of the power to communicate concerning tender offers. Though the *CTS* Court found no need to step beyond the *MITE* plurality's reasoning, the clear light of *Piper* leaves *MITE* very much in the shadows on this point.

To the extent the *MITE* plurality requires a balance of strategic power between bidder and management, the nature of the deterrence is relevant. The Act bans second-step mergers for three years following the interested stockholder's stock acquisition date, absent prior approval by the board of directors. After three years, a business combination may take place if: a) the prior board approval existed; b) the business combination is approved by the affirmative vote of the holders of a majority of the voting stock not beneficially owned by the interested stockholder at a meeting called for that purpose; or c) if certain stock price conditions are met. Wis.Stat. § 180.726(3). The Act does not ban takeovers *per se*, but merely delays for three years the successful bidder's ability to attain complete control over the corporation.

■ A delay of the free exercise of power is not unconstitutional, for "the Williams Act would preempt a variety of state corporate laws of hitherto unquestioned validity if it were construed to preempt any state statute that may limit or

delay the free exercise of power after a successful tender offer." *CTS*, 107 S.Ct. at 1647. For example, staggered terms for directors and cumulative voting provisions, allowed in most states, may delay the time when a successful bidder gains control over corporate affairs. *Id.* at 1647–48. "The long-standing prevalence of state regulation in this area suggests that, if Congress had intended to preempt all state laws that delay the acquisition of voting control following a tender offer, it would have said so explicitly." *Id.* at 1648.

The delay protects shareholders by discouraging unapproved freezeouts, or second-step mergers whereby remaining shareholders are forced to sell their stock for cash or securities. Tender offers contemplating freezeouts may be particularly coercive. The Supreme Court has recognized that protecting shareholders against the possibility of coercion in tender offers is a legitimate state concern. *Id.* at 1651.

Further, to find the three year delay unconstitutional would be to implicitly adopt an economic policy favoring tender offers as inherently good. The fundamental reason for the Williams Act's neutrality concerning management and bidder reflects a comprehensive view of tender offers:

> It was strongly urged during the hearings that takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management. It was also recognized that these bids are made for many other reasons, and do not always reflect a desire to improve the management of the company.

S.Rep. No. 550, 90th Cong., 1st Sess. at 3. The Wisconsin act effectively eliminates hostile leveraged buyouts, in which the assets of the target company provide resources for servicing the debt incurred by the bidder in taking control. To the extent hostile offers of this nature might be deterred, shareholders may not be offered the opportunity to take advantage of the escalating stock prices likely to accompany the speculation often attending tender offers. But the state, through its legislation, may favor long-term growth and capital investment over short-term speculation.

Reflecting to some extent the 1967 Senate Report quoted above, the Supreme Court has recently given voice to the flux of economic theory enmeshing theoretical discussion of tender offers:

> No one doubts that some successful tender offers will provide more effective management or other benefits such as needed diversification. But there is no reason to *assume* that the type of conglomerate corporation that may result from repetitive takeovers necessarily will result in more effective management or otherwise be beneficial to shareholders. The divergent views in the literature— and even now being debated in the Congress—reflect the reality that the type and utility of tender offers vary widely. Of course, in many situations the offer to shareholders is simply a cash price substantially higher than the market price prior to the offer.

*CTS* 107 S.Ct. at 1651 n. 13. Absent clear legislative directive, it is inappropriate for this court to posit all the world as Wall Street, where all the shareholders would be arbitrageurs. "The Constitution does not require the States to subscribe to any particular economic theory. [The courts] are not inclined 'to second-guess the empirical judgments of lawmakers concerning the utility of legislation,' *Kassel v. Consolidated Freightways Corp.*, 450 U.S. at 679, 101 S.Ct. at 1321 (Brennan, J., concurring in judgment)." *CTS*, 107 S.Ct. at 1651. Individual shareholders remain free to invest their money in corporations domiciled in legislative environments more conducive to speculation. If they feel hindered in this regard because they believe their shares are undervalued, they should perhaps be mindful that any stock investment bears a number of inherent risks, including the possibility that a tender offeror may never appear and bully market prices momentarily skyward.

The Act can not reasonably be said to impair shareholder decision-making in the tender offer process. The Act neither affects disclosure or timing, nor forbids

tender offers themselves. The Act does provide shareholder protection in an area of legitimate state concern. Assuming the Act prevents potential bidders from ever making some tender offers, the impact of this deterrence presently appears incalculable and irrelevant. What might be of consequence is the extent to which bidders fail to receive board approval. However, a target attractive to one suitor will generally be attractive to others. Shareholders who feel the board is responding inappropriately to bidders maintain their power to effect changes in corporate control, thereby enhancing receptivity to offers. If management, for its part,

> were to take actions designed to diminish the value of the corporation's shares [to fend off suitors], it may incur liability under state law. But this problem does not control our preemption analysis. Neither the [Williams] act nor any other federal statute can assure that shareholders do not suffer from the mismanagement of corporate officers and directors.

*Id.* at 1647.

In view of the shareholders' presumed influence over management, the three year delay is not logically distinguishable from other delays or inhibitions of takeovers, such as staggered terms for directors and supermajority merger vote requirements, currently permitted in many states, notwithstanding that the latter limitations often may be more directly controlled by shareholders. The Act prevents business combinations for three years, but does not hinder the successful offeror's exercise of any other attributes of control. Nothing in the Act prevents a potential bidder from seeking board approval in the first place. Nor does anything prevent an offeror from making a tender offer conditioned on board approval, whereby the suitor can effectively communicate its message to shareholders and enhance shareholder awareness. "A person is not the direct or indirect beneficial owner of stock tendered pursuant to a tender or exchange offer ... until the tendered stock is accepted for purchases or exchange." Wis.Stat. § 180.726(1)(d)(2).

Based on its reading of Supreme Court case law, the court in *BNS v. Koppers Co., Inc.,* 683 F.Supp. at 469 (D.Del.1988), indicated that, notwithstanding a statute's "substantial alteration of the balance between management and the offeror.... even statutes with substantial deterrent effects on tender offers do not circumvent Williams Act goals, so long as hostile offers which are beneficial to target shareholders have a meaningful opportunity for success." But the Supreme Court does not appear to have formulated a "meaningful opportunity" test. Indeed, such a test would raise perplexing problems of determining which hostile offers are "beneficial to shareholders," measuring "substantial deterrence," and defining "meaningful opportunity for success." And, of course, not all initially "hostile" offers remain hostile: many will inevitably result in negotiated transactions between the offeror and the target. The *BNS* court itself evidently found "meaningful opportunity" to exist, despite its conclusion that opportunities left open by the statute were heavily weighted against the offeror. *Id.* at 470–72. The same court subsequently found meaningful opportunity to exist based on statistical analysis in *RP Acquisition Corp. v. Staley Continental, Inc.,* 686 F.Supp. 476 (D.Del.1988), but similar arguments made to this court were less than convincing on either side, particularly given the controversy surrounding these matters in the academic community and legislatures. *Cf. West Point–Pepperell, Inc. v. Farley Inc. and Trust Co. Bank,* 711 F.Supp. 1096 (N.D.Ga.1989) (noting difficulty of accurately applying "hostile/hostile" and other labels, as well as inadequacy of available data to show lack of meaningful opportunity). Ultimately, meaningful opportunity for success under the Wisconsin act can be controlled by shareholder vote in the light of board response to potential suitors. The board of directors itself, it should be remembered, remains subject to scrutiny under fiduciary standards for decisions made on behalf of the corporation.

Universal contends that even if a meaningful opportunity for tender offer success

is required, the Act offers it. A hostile offeror may wage a proxy contest, purchase a controlling interest, elect sympathetic board members, dictate corporate policies, or otherwise assume voting control. Amanda contends that the Act makes a proxy contest impracticable if not legally impossible. Without finding a clear legal or practical foundation for a "meaningful opportunity" requirement, I note that foreclosing a proxy contest opportunity could frustrate or even preclude shareholder autonomy and the exercise of informed choice.

Under Wis.Stat. § 180.726(1)(j)(1)(a), an "interested stockholder" includes one who is the "beneficial owner of at least 10% of the voting power of the outstanding voting stock." Wis.Stat. § 180.726(1)(d)(1)(d) defines "beneficial owner" as including one who "has a written or unwritten agreement, arrangement or understanding with another person that is directly or indirectly a beneficial owner ... of the stock, if the agreement, arrangement or understanding is for the purpose of acquiring, holding disposing of or voting the stock, unless the voting is pursuant to a revocable proxy or consent described in subd. 1.c."

Amanda argues that if it attempted to engage in a proxy contest, "any 'agreements' or 'understandings' it had with other shareholders whose holdings together with Amanda's total more than 10% would alone trigger the prohibitions of the Anti–Takeover Act *before* any shareholder vote." Plaintiff's Reply Memorandum at 35. In making its argument and reciting § 180.726(1)(d)(1)(d), Amanda neither quotes nor considers that provision's closing phrase, "unless the voting is pursuant to a revocable proxy or consent described in subd. 1.c." Wis.Stat. § 180.726(1)(d)(1)(c) provides in pertinent part:

> [A] person is not the beneficial owner of stock under this subd. 1. c if the agreement, arrangement or understanding to vote that stock arises solely from a revocable proxy or consent given in response to a proxy or consent solicitation made in accordance with the applicable regulations under the exchange act and is not reportable under the report

required under 17 CFR 240.13d–1(1)(a) [sic] or a comparable or successor report.

A shareholder must file a disclosure report under 17 CFR 240.13d–1(a) upon becoming beneficial owner of 5% of any equity or security of a specified class. In turn, 17 CFR § 240.13d–3(b) provides:

> Any person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose of [sic] effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the act shall be deemed for purposes of such sections to be the beneficial owner of such security.

Under these provisions, it appears possible that a potential offeror could wage a campaign pursuant to revocable proxy as long as that offeror does not otherwise beneficially own 5% of the stock specified, and as long as the proxy is not used "as part of a plan or scheme to evade the reporting requirements." To ensure clarity of intention, the potential offeror has available 17 CFR § 240.13d–4, allowing him to "expressly declare in any statement filed that the filing of such statement shall not be construed as an admission that such person is, for the purposes of sections 13(d) or 13(g) of the Act, the beneficial owner of any securities covered by the statement." Presumably, these provisions allow the shareholder sufficient room to avoid conflict with the Wisconsin act. While such a proxy campaign may require only a modicum of planning, some degree of foresight is expectable from most potential offerors. Though one who is or will become an offeror may cross the share ownership threshold inadvertently, *see Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), such an error is not necessarily fatal under federal law and appears reversible under the Wisconsin act. Wis.Stat. § 180.726(5).

This question may be a close one, though other grounds for distinguishing interested

stockholders from those conducting proxy contests also may be conceivable under the Act. Amanda, however, did not even engage in a proxy battle that might clearly invoke the need for further analysis. If the issue calls for any consideration, it presently suffices that a possible distinction appears on the statute's face. Given the presumption of constitutionality, and the evident continued availability of proxy opportunities to those interested, I can not find a constitutional violation on this ground.

Finally, I emphasize that corporations, as well as related powers and rights, are defined by state law. Federal law has long recognized the states' power to regulate the internal affairs of corporations. *See, e.g., Santa Fe Industries v. Green,* 430 U.S. at 479, 97 S.Ct. at 1304 (1977); *Cort v. Ash,* 422 U.S. at 84, 95 S.Ct. at 2090 (1975). The Williams Act itself is subject to § 28(a) of the Exchange Act, 15 U.S.C. § 78bb(a), providing:

> Nothing in this title shall affect the jurisdiction of the Securities Commission (or any agency officer performing like functions) of any state over any security or any person insofar as it does not conflict with the provisions of this title or the rules and regulations thereunder.

With Justice Scalia I must agree: "[u]nless it serves no function, that language forecloses preemption on the basis of conflicting "purpose" as opposed to conflicting "provision." *CTS,* 107 S.Ct. at 1653. Nonetheless, because the *CTS* majority saw no need to explicitly question the *MITE* plurality's reasoning, I have considered this case under the Supreme Court's careful analysis of the Williams Act's purposes. Having done so, I must conclude that the Williams Act does not preempt the Wisconsin act.

## B. The Commerce Clause Challenge

Amanda also argues that the Wisconsin act violates the commerce clause. This argument is effectively considered by using the *CTS* commerce clause analysis.

■ "The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce." *CTS* 107 S.Ct. at 1648 (citations omitted). But the Wisconsin act does not fall into this category since it has the same effect on tender offers whether or not the offeror is a Wisconsin resident or domiciliary. The Act affects both interstate and local business equally. That the Act, as a practical matter, might most often affect out of state entities because most hostile tender offers for Wisconsin corporations will come from offerors outside Wisconsin does not disturb this conclusion. Because the Act does not impose any greater burden on out-of-state offerors than it does on similarly situated Wisconsin offerors, it does not discriminate against interstate commerce. *Id.* at 1649 (quoting *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980)).

■ The commerce clause will also invalidate statutes that adversely affect interstate commerce by subjecting activities to inconsistent regulations. *Id.* at 1649 (citations omitted). However,

> [n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders. See Restatement (Second) of Conflict of Laws § 304 (1971) (concluding that the law of the incorporating State generally should "determine the right of the a shareholder to participate in the administration of the affairs of the corporation").

*Id.* at 1649. Because the Act only regulates corporations chartered by Wisconsin, it creates no impermissible risk of inconsistent regulation by different states.

A majority of the *MITE* Court subscribed to a balancing test, under which "even when a state statute regulates interstate commerce indirectly, the burden imposed on that commerce must not be excessive in relation to the local interests served by the statute." *MITE,* 457 U.S. at 643, 102 S.Ct. at 2641 (citing *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)). However, the Illinois

statute under consideration in *MITE* obviously failed the more traditional commerce clause tests: it applied to tender offers for any corporation for which 10% of the outstanding shares were held by Illinois residents and it purported to give Illinois the power to determine whether a tender offer for such a corporation could proceed anywhere. *MITE*, 457 U.S. at 643, 102 S.Ct. at 2641. At the same time, in assessing the Illinois statute's impact on interstate commerce, *MITE* presented a rather idealized vision favoring tender offers as a seemingly faultless mechanism for reallocating economic resources to their highest valued use and thereby improving efficiency and competition. *Id.* at 643, 102 S.Ct. at 2641. The Court has since viewed the securities market in a more realistic light, recognizing that some successful tender offers will provide these economic benefits, but "there is no reason to *assume* that ... [what] will result is more effective management or otherwise ... beneficial to shareholders." *CTS*, 107 S.Ct. at 1651 n. 13. The *CTS* Court did not explicitly apply or even accept the balancing test. Speaking specifically of corporations and securities, it merely concluded that a state need not define "commodities [owing their existence and attributes to state law] as other states do; it need only provide that residents and nonresidents have equal access to them." *Id.* at 1652.

To the extent *CTS* does implicitly compare burdens on interstate commerce with statutory benefits, its discussion is grounded on two vital assumptions. First, making corporation law is the states' prerogative:

A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created.

*Trustees of Dartmouth College v. Woodward*, 4 Wheat. 518, 636, 4 L.Ed. 629 (1819), *quoted in CTS*, 107 S.Ct. at 1649–50. Second, state laws regulating corporate governance, in prohibiting certain transactions and regulating others, "necessarily affect certain aspects of interstate commerce." *Id.* at 1650. "A State has an interest in promoting stable relationships among the parties involved in corporations it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs." *Id.* at 1651.

The *CTS* Court found only one specific benefit of the Indiana statute: protecting shareholders from coercive tender offers. *Id.* at 1651. The Wisconsin act not only provides this benefit, but also protects against highly leveraged buyouts that threaten to strip the target's assets without necessarily improving economic efficiency or shareholders' positions. Amanda counters that the Act fails to prevent management-approved abuses of this very nature. Certainly the state has a "substantial interest in preventing the corporate form from becoming a shield for unfair business dealing." *Id.* at 1651–52. The Act preserves management liability for breaching its duties to shareholders. Nothing obligates a state legislature to cure every related corporate ill when enacting corporate regulations aimed at particular problems.

■■■ Amanda further argues that the Act infringes shareholder autonomy, giving management a virtual veto power over nationwide tender offers. Whether the Act disenfranchises shareholders is more appropriate in relation to the Williams Act preemption issue, where it has already been discussed, *supra*. Amanda's argument does raise the commerce clause question of whether the Act grants a power to management that results in an excessive burden on interstate commerce.

The Act may deter some tender offers. But it also appears designed to promote careful choice concerning allocation of economic resources to maximize managerial efficiency. Again, tender offers are not necessarily beneficial, and absent clear violation of federal law, the economic utility of legislation is best left to the empirical judg-

ment of legislatures rather than the courts. *Id.* at 1651. The Supreme Court has "rejected the 'notion that the Commerce Clause protects the particular structure or methods of operation in a ... market." *Id.* at 1652 (quoting *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 127, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978), *reh'g denied, Shell Oil Co. v. Governor of Maryland,* 439 U.S. 884, 99 S.Ct. 232, 58 L.Ed.2d 200. Clearly, the Act focuses on legitimate state interests.

To reiterate points made with respect to the Williams Act, the Wisconsin act does not prevent tender offers. The *CTS* Court's statement on Indiana's statute is applicable to Wisconsin's law: "This act does not prohibit any entity—resident or nonresident—from offering to purchase, or from purchasing, shares in [domestic] corporations, or from attempting thereby to gain control." *CTS,* 107 S.Ct. at 1652. The Act limits certain kinds of self-dealing. Ultimate decision-making power remains with the shareholders, who can elect directors reflecting the shareholders' receptivity to tender offers. And as with management, the Act preserves directors' responsibility for decisions made on behalf of the corporation. The Act's actual effect on tender offers is uncertain. Some degree of deterrence is acceptable. Because the Act regulates matters properly within the ambit of state power, while treating residents and nonresidents equally, "even if the act should decrease the number of successful tender offers for [domestic] corporations, this would not offend the Commerce Clause." *Id.* at 1652. At best, any effect on interstate commerce is incidental to legitimate state regulation.

Some legislative purposes underlying the Act may well reflect protectionist motivations, such as the evident desire to protect resident domestic corporations against hostile takeovers that might result in target corporation operations leaving Wisconsin. But the Act appears no more indicative of such interests than the Indiana act upheld in *CTS.* To probe legislative history or intent in this case is not helpful. As *CTS* suggests, it is inappropriate for this court to define an economic policy concerning the inherent economic value of tender offers. In my view, Justice Scalia is again correct in stating that

> [a]s long as a State's corporation law governs only its own corporations and does not discriminate against out-of-state interests, it should survive this Court's scrutiny under the Commerce Clause, whether it promotes shareholder welfare or industrial stagnation. Beyond that, it is for the legislature to prescribe its invalidity.

*Id.* at 1653 (Scalia, J., concurring in part and concurring in judgment). But in reaching my conclusion it is not necessary to recognize the practical impossibility and judicial imprudence of assessing the propriety and importance of local values, measuring a statute's effectiveness in promoting these values, and making "the ultimate (and most ineffable) judgment as to whether, given importance-level $x$, and effectiveness-level $y$, the worth of the statute is "outweighed" by impact-on-commerce $z$." *Id.* at 1653. Rather, in the absence of actual discrimination against interstate commerce or an impermissible risk of inconsistent regulation, motivations underlying the Act's passage are not accurately probative of constitutionality.

Insofar as the Act might arise from protectionist purposes, these purposes are subsumed by the statute's legitimate functions. Where statutory language has a plain and unambiguous meaning, "only the most extraordinary showing of contrary intentions from those data would justify a limitation on the 'plain meaning' of the statutory language. When we find the terms of a statute unambiguous, judicial inquiry is complete, except in 'rare and exceptional circumstances.'" *Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984) (citations omitted), *reh'g denied,* 469 U.S. 1230, 105 S.Ct. 1235, 84 L.Ed.2d 371 (1985). *Cf. Piper,* 430 U.S. at 24–27, 97 S.Ct. at 940–42 (analysis begins with the statute itself; reliance on legislative history in defining legislative intent is "a step to be taken cautiously"); *cf. Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 201, 96 S.Ct. 1375, 1385, 47

L.Ed.2d 668 (1976) (language of statute is controlling when sufficiently clear in its context); *cf. United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1961) (if statutory language is unequivocal, there is no need to resort to legislative history), *reh'g denied,* 368 U.S. 870, 82 S.Ct. 24, 7 L.Ed.2d 70. This conclusion is underscored by the presumption of constitutionality. The Wisconsin act, on the record before this court, does not effectively burden interstate commerce in violation of the commerce clause.

## VI. THE SHAREHOLDERS RIGHTS PLAN

On September 8, 1988 at a regularly scheduled board meeting, the Universal board adopted its shareholders rights plan without shareholder approval. The rights plan had been under consideration by the Universal board beginning with its board meeting in November 1987. At almost every board meeting since that time, the board discussed the plan and received advice from both its regular outside counsel and New York counsel on the operation and benefits of the plan. New York counsel described the rights plan as common and stated that it was "designed to counteract the advantages enjoyed by corporate raiders and to enable boards of directors to better protect shareholder interests in the face of coercive acquisition techniques." New York counsel also described as one of the principal purposes of the plan the option of permitting a company to remain independent "to preserve for shareholders the long-term value of the company in the event of a takeover." In adopting the plan on September 8, 1988 the board reviewed and considered the takeover policy statement previously adopted by the board on June 5, 1980. That policy statement declared that in considering any acquisition proposal, the board shall consider, among other things,

- the board's estimate of the then current value of the company in a freely negotiated transaction,
- the board's estimate of the future value of the company as an independent and ongoing business entity, and
- the adequacy of the price offered.

The rights plan adopted by Universal is a second generation rights plan and is known in Wall Street parlance as a poison pill.

Universal's rights plan operates in the following manner. The board has issued rights to each of its shareholders which attach to the shareholders' stock and do not trade separately until there is a triggering event as defined in the plan which causes the rights to detach and trade separately. In Universal's plan, that event is the accumulation of more than 20 percent of the corporation's stock or a tender offer for more than 20 percent of the stock. In the case of a tender offer, after ten days from the announcement of the tender offer the rights detach, certificates for the rights are issued, and they trade separately. Detachment of the rights may be delayed by the board, and in the instant case Universal's board has delayed the separation of the rights from the underlying shares. Under the plan the Universal board is empowered to redeem the rights at a nominal cost to the company at any time before certain triggering events which are described below. It is the redemption of these rights that Amanda seeks by its motion.

Universal's plan contains both "flip in" and "flip over" provisions. The triggering event for the "flip in" provision is the purchase of 20 percent or more of Universal's shares by the tender offeror, in this case Amanda. This triggering event gives each Universal shareholder other than the tender offeror, immediately and without board intervention, the right to purchase additional Universal shares at one-half the then quoted market value. The purchase price of the shares as stated in the plan is $75.00. Therefore, each Universal shareholder will be able to purchase $150.00 of Universal's stock for the $75.00. If one assumes that the offer price of $35.00 is the then quoted market value, this "flip in" provision allows each shareholder to purchase over four new shares for each share now held at a 50 percent discount. If Amanda meets its minimum tender condition of 75 percent of the Universal stock, the "flip in" provision would be triggered

and would dilute Universal's stake in Amanda from 75 percent to 36.2 percent. Amanda's experts testified that this would cost Amanda over $115 million in lost equity investment.[5]

There is however an exception to the "flip in" provision. If Amanda is able to purchase 80 percent or more of the outstanding Universal shares the "flip in" provision does not function and will cause no dilution to Amanda's stake in the company. Universal's experts testified that this provision affords a reasonable limitation upon the plan and is one respect in which Universal's plan differs from many other rights plans.

The "flip over" provision is triggered if Amanda seeks to merge Universal into Amanda or a subsidiary of Amanda, or if Amanda or an entity which it controls purchases substantially all of the assets of Universal.[6] Under the "flip over" provision, once one of the triggering events occurs the holders of the rights can purchase shares of Amanda at a 50 percent discount. By way of example, if Amanda acquired 90 percent of Universal's outstanding shares in the offer and attempted to merge with Universal, the remaining 10 percent shareholders would be able to purchase $150.00 worth of Amanda's shares at $75.00. This would dilute Amanda's equity interest in Universal from 90 percent to approximately 63 percent, and testimony showed that the financial stake would be diluted by approximately $80 million.

Universal contends that the "flip over" provision of the rights plan subjects an acquiror to the substantial dilution only if it tries to squeeze out shareholders who choose not to sell in a tender offer. Universal contends that this provision chiefly affects only those offerors who are pursuing highly leveraged financing deals and who seek a prompt squeeze-out merger to enjoy unfettered use of corporate assets to pay down the debt incurred in the acquisition. Universal argues that a suitor of more substantial means, whose financing did not compel it to immediately liquidate corporate assets and business units to repay debt, would not be deterred by the "flip over" provision. The "flip over" provision would not prevent an offeror from purchasing a majority of shares and then operating Universal as a subsidiary. However, testimony at the hearing did establish that the majority of nationwide tender offers in 1988 contemplated a back end merger between the target and the offeror companies. Amanda's experts testified that the operation of the "flip over" provision would make the acquisition prohibitively expensive for Amanda.

There is another provision of the plan which provides an exception to the poison pill operation. This provision states that if a potential offeror holds no more than 1 percent of Universal's stock, and meets certain other conditions, it can request a shareholder meeting and seek a vote of the shareholders approving the offer. If the shareholders approve the offer, the rights must be redeemed for that offer at or above the offer price. This provision was not available to Amanda because affiliates owned approximately 3.6 percent of the Universal shares when the pill was adopted in September. Universal maintains that Amanda could sell down its shares to less than 1 percent and request the shareholder vote. However, the experts agreed that this would be a very unusual course for a tender offeror to take.

Amanda contends that the poison pill is the latest of a number of measures adopted by the board which establish its management entrenching and "Fort Apache" mentality. The first step was the payment of

---

**5.** Amanda further contends that under Wis.Stat. § 180.725, it would not be able to restore the millions of shares it bought to full voting power, and the voting stake would be reduced from the 36.2 percent to approximately 25 percent. Amanda describes Wis.Stat. § 180.725 as providing that every share of Universal stock owned by Amanda in excess of 20 percent of the total is reduced in voting power to one-tenth vote per share.

**6.** A condition of Amanda's financing is a back end merger of the company with Amanda. Therefore, even if Amanda does manage to procure 80 percent of the outstanding stock, fulfillment of the offer's financing conditions would trigger the "flip over" provision.

greenmail in February 1988 to an investment group which owned approximately 4.9 percent of Universal stock and had approached the board with an unsolicited leverage buy out (LBO) overture. This greenmail payment took the form of Universal's repurchase price of $33.00 per share for approximately 544,000 shares of Universal's stock held by the investment group. At the time of repurchase, Universal's stock was trading at approximately $27⅝ on the New York Stock Exchange, and the greenmail payment represented a premium over market value for the repurchased shares of about $5.375 per share.[7]

The other two defensive measures adopted by the board at the September 8 meeting included a 3 for 2 stock split and the creation of an employees' stock ownership plan (ESOP). Amanda contends that each of these measures, in addition to the poison pill, was adopted specifically in response to the takeover speculation concerning Universal during the summer of 1988. As previously noted, Amanda's tender offer was commenced on December 2, 1988. It is undisputed that the Universal rights plan was not adopted in response to the Amanda offer.

The offer initially was $30.50 per share for all shares of Universal common stock and included a number of conditions. The initial offer was set by its terms to expire December 30, 1988 at midnight. The offer was increased on December 15, 1988 to $35.00 per share. The present offer is due to expire on April 4, 1989. Amanda contends that the Universal management and board response to not only the initial offer but also the increased offer was not in accord with the board's fiduciary duties of loyalty and care which it owes to the shareholders of the company. Amanda also contends that the continued refusal to redeem the rights is a breach of the board's fiduciary duties.

■ Amanda is challenging Universal's use of its rights plan to effectively stop the offer without a vote by its shareholders. While it is disputed that the poison pill has the effect Amanda claims, the issue is ripe for a decision at this juncture because the redemption of the poison pill is one of the conditions of the offer and the experts agree that Amanda's offer will not proceed absent the redemption. The parties agree that redemption of the pill is governed by Wisconsin law (redemption is sought for breach of fiduciary duty, a pendent state law claim in this suit) and that, in the absence of Wisconsin precedent, a Wisconsin court would look to Delaware case law for resolution of this issue. *See, Wanvig v. Johnson Controls, Inc.*, No. 663–487 (Milw. Co.Cir.Ct. March 29, 1885) (found at Def. App.L.); *Steven v. Hale–Haas Corp.*, 249 Wis. 205, 221, 23 N.W.2d 620, 628 (1946).

■ It is undisputed that the Universal board's adoption of the rights plan as a defensive mechanism to combat hostile tender offers is a valid exercise of its business judgment to be protected by the business judgment rule, *see Moran v. Household International, Inc.*, 500 A.2d 1346, 1348 (Del.1985), and specifically authorized by Wisconsin law. Wis.Stat. § 180.155. This specific authorization by the Wisconsin legislature of a rights plan as adopted by Universal distinguishes this case from *West Point Pepperell, Inc. v. Farley, Inc.*, 711 F.Supp. 1096 (N.D.Ga.1988) (found at Pl.App.L) (where the court found no authority in either state law or the corporate articles of incorporation authorizing the adoption of a rights plan). Wis.Stat. § 180.155 authorizes a board of directors to adopt a rights plan without shareholder approval.

What is in dispute in this case is whether the board's decision to refuse to redeem the rights plan in the face of Amanda's offer is a violation of its fiduciary duties of loyalty and care which are owed to the shareholders of the company. Universal argues that its decision is entitled to the protections of the business judgment rule

---

**7.** The Pioneer Group, a substantial Universal shareholder since about January 1976, sent a letter of protest to the board complaining of the greenmail payment. Murray's testimony at the hearing established that the board offered the Pioneer Group exactly the same deal for the repurchase of its shares, and the group rejected that offer.

and should not be disturbed by the court absent a showing by Amanda of bad faith or self dealing on the part of the board. Amanda argues that a Wisconsin court would use the Delaware approach first adopted in *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985). *Unocal* requires, in a takeover context, a threshold showing by the board of "reasonable grounds for believing that a danger to corporate policy and effectiveness existed" and that their actions were "reasonable in relation to the threat posed." *Id.* at 955.

The Delaware supreme court recognized in *Unocal* that in takeover context there is an "omnipresent specter that a board may be acting predominantly in its own interests, rather than those of the corporation and its shareholders ...," 493 A.2d 954, which would call for judicial examination at the threshold before the protections of the business judgment rule may be conferred." *Id.* Adoption of takeover measures presents the board with the initial burden of establishing reasonable grounds for believing that a danger to corporate policy and effectiveness existed. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986). The board must show initially that it acted on an informed basis, in good faith, and in the honest belief that the action was taken in the best interests of the corporation. *Moran*, 500 A.2d at 1356. If a board meets its threshold burden, the business judgment rule applies to the board's decision and the plaintiff must show bad faith or self-dealing by the board. *Id.*

■■■■ I agree with Amanda that a Wisconsin court would apply the *Unocal* standard for reviewing a board's actions in connection with a hostile takeover offer, notwithstanding other jurisdictions' rejection of this standard. *See, e.g.,* Ohio Rev. Code § 1701.59(C) (rejection of *Unocal* and codification of existing common law). In this regard I note that Wis.Stat. § 180.155 appears to have codified the holding of *Moran* (regarding adoption of shareholders rights plans), and Wis.Stat. § 180.305 allows a director to consider other constituencies in the discharge of his or her duties (which appears to have codified *Revlon's* holding that a board can consider other constituencies in the context of a tender offer). However, as the facts stated below will demonstrate, even under the shifting burdens imposed by *Unocal*, I find that the Universal board acted reasonably in relation to a threat to the corporate policies and effectiveness which it in good faith believed was posed by Amanda's offer.

As previously noted, Mr. Press called Mr. Osborn on December 1 mid-afternoon to announce that the hostile tender offer would be initiated the next day and to inform Osborn that Amanda intended to initiate litigation against Universal in connection with the tender offer. Osborn advised Press to submit a written offer. A letter was telecopied from Mr. Press to Mr. Murray, chairman of Universal Foods and received by Osborn at approximately 4:00 P.M. The letter stated that all aspects of the offer were negotiable including the consideration to be paid. Osborn has described the tone of the phone conversation as the functional equivalent of Press putting a gun to his head. Later that afternoon, Murray called Osborn from Newark, New Jersey. Murray was advised of the phone call and the substance of Press' letter. Both Murray and Osborn determined that the offer was clearly inadequate based upon their familiarity with Universal's long-range business plan and the company's future prospects. The two had discussions with Universal's general counsel and chief financial officer concerning High Voltage (the parent of Amanda) and determined that High Voltage was a small company with no product lines related to those of Universal. On the evening of December 1 Murray and Osborn had Mr. O'Reily, the general counsel, draft a press release to publicly disclose the fact of the offer, to state that the board of directors would meet in due course, and that Murray and Osborn would recommend to the board that it adopt or maintain its "not for sale" position. It is undisputed that both Murray and Osborn adopted their respective positions with regard to the offer prior to seeing the actual offer to purchase.

Numerous events occurred on December 2 and over the next couple of days. Osborn and Murray contacted each of the directors to inform them of the offer and to arrange a board meeting to discuss and determine how to respond to the offer. The December 1 press release was issued, which actually crossed the Wall Street wires in the early morning of December 2. Later in the morning on December 2, Osborn issued a memo to all Universal Foods locations announcing his and Murray's intentions to recommend that the board reaffirm its "not for sale" position. Osborn ordered the company's Washington lobbyist to contact relevant government officials to tell them that Universal opposes the tender offer. Murray and Osborn calculated, on December 2, 1988, the number of friendly shares that could be counted on to oppose the offer.[8] Amanda also claims that Osborn and Murray spent the weekend contacting the independent directors and lining up the directors' uninformed opposition to this offer. However, the testimony shows that the directors, after learning of the offer, determined on their own to remain independent, to avoid contact with Universal's management, and to await review of the offer and the board of directors meeting to determine the company's response to the offer.

The board of directors meeting was scheduled for December 8, 1988. After scheduling the meeting, Murray and Osborn requested that William Sword and Company, Inc., an investment banking firm, prepare for the meeting a list of all the alternatives a board could consider in responding to Amanda's offer. Additionally, Goldman, Sachs & Co., Universal's investment banking advisor, was given free access to all financial and business information it requested. However, no investment banker's opinion as to the adequacy of the offer was requested by Murray and Osborn. Both gentlemen, as well as the independent directors who testified at the hearing (Veneman and Kendall), felt that they were familiar enough with Universal and its business plans and the future of the company to know without an investment banker's opinion that the $30.50 offer was inadequate.

At the December 8 meeting, all thirteen directors were in attendance, and the meeting lasted between seven and eight hours. The board heard the presentation of Sword and Company, and also heard from its legal counsel, both regular outside counsel and specially retained counsel. The investment banking advisor, Goldman Sachs and Company, was also in attendance at the December 8 meeting. However, Goldman Sachs did not give a presentation at the meeting concerning the economics of the Amanda offer, or an opinion as to the fairness of the offer or the value of the company as an independent and ongoing business entity. Legal counsel advised the directors of all aspects of the offer, and also advised the directors of their duties as fiduciaries for the shareholders under the law. Legal counsel stated that the directors could, consistent with their fiduciary responsibility, make a well-informed decision that the company and the shareholders would be better off by not tendering and remaining independent.

The presentation by Sword and Company involved at least 12 alternative courses of action which the board could pursue in responding to the offer which included recapitalization, management LBO, white knight/"Crown Jewel" lock-up options, further acquisitions by Universal, use of a pac-man defense, etc. The board rejected recapitalization and LBO options as being unviable due to the amount of debt which Universal would incur, and rejected negotiations with the bidder because of the low price of the $30.50 offer. At the hearing, the directors testified that they did not request an adequacy opinion from Goldman Sachs because they did not want to signal Wall Street that this offer was too low and Amanda should sweeten the pot and come back with a higher offer. The board felt that it was in the best interests of the

---

**8.** These shares included 195,000 shares in the company pension plan, 32,150 shares held by Universal's charitable foundation, 276,953 held by Universal's 401K Benefit Plan, and 116,292 shares held by Universal's ESOP and 554,936 owned by Universal's officers and directors.

company and the shareholders to remain independent so that the shareholders could reap the benefits of the repositioning of the company which was begun in 1984 and was only now being realized.

Amanda has gone to great pains throughout these proceedings to show by affidavit, exhibit or testimony that Universal did not get an adequacy opinion from Goldman Sachs, did not fully comply with its own takeover policy, and acted in a completely self-serving fashion in rejecting the offer at the December 8 meeting. However, testimony and the board minutes show that after the various presentations, the management board of directors left the room, and the ten independent directors, in the presence of legal counsel, discussed for some considerable time the offer and its impact on the company. The Universal board of directors went to great lengths to maintain its independence in connection with this offer and, considering ten of the thirteen members are actually independent, I find no evidence in the record which convinces me that the board failed to review this offer in a dispassionate and neutral manner. The independent directors had informally decided to recommend to the shareholders to reject Amanda's offer and remain independent. At that juncture management directors returned to the room, and the independent directors explained to Goldman Sachs the course of action they intended to follow. They asked for the Goldman Sachs position on that and whether or not the investment banker would stand behind the board. The Goldman Sachs advisor answered in the affirmative. It was at that point the board formally voted to recommend the shareholders reject the Amanda offer.

Were the actions of the board of directors at the December 8 meeting in violation of their fiduciary duties to their shareholders? I think not. As I noted, the meeting lasted for seven to eight hours, the directors thoroughly reviewed the offer, and the independent directors remained independent and did not rubber-stamp the initial position of management. Even if there were some indiscretion on the part of management in initially opposing the offer, that in itself would not support this court ordering redemption of the poison pill or the rights plan. Professor Gerald, an economic expert who testified on behalf of Amanda at the hearing, was asked during his testimony whether the board made a mistake in recommending at the December 8 meeting that the shareholders not tender. His answer was, "They got $35.00 after that." None of the shareholders are any worse off for the actions taken by the Universal board through the December 8 meeting and in fact are much better off due to the increased offer which Amanda made on December 16, 1988.

On December 20, 1988 the board again met, this time to review the increased $35.00 per share offer made by Amanda. This meeting lasted almost four hours. At the December 20, 1988 directors meeting, the board again received presentations from legal counsel, both concerning the revised offer and the course of the litigation which Amanda had commenced. The ten independent directors again considered the offer outside of the presence of the management directors. The directors testified that they considered the revised offer in light of Universal's long-range plans, the future growth of the company, the lack of experience and lack of any connection with the food industry on the part of HVE, Levy and Press. Goldman Sachs made a presentation to the board involving the financing and debt to be incurred in the tender offer and Universal's cash flow and determined that the cash flow after the Amanda acquisition would be insufficient to cover both Universal's cash needs and the heavy acquisition debt.[9] Joseph R. Zimmel, Goldman Sachs' representative, informed the board at the December 20 meeting that the reductions in research and development, capital expenditures, and personnel layoffs

---

**9.** At the January 26, 1989 board meeting which immediately preceded the annual shareholders' meeting, Goldman Sachs did a similar presentation for the board. The January 26 presentation increased Goldman Sachs' analysis of the negative cash flow resulting from the tender offer, for a total negative cash flow after the offer of $169,000,000.

would be likely considering its analysis in the negative cash flow. Another source of servicing that cash flow would be additional borrowings by Amanda or HVE. This analysis led the board to determine that it would not only be in the best interests of the shareholders to reject the tender offer because it was inadequate, but also in the best interests of its other constituencies as contemplated in Wis.Stat. § 180.305.

It is undisputed, however, that none of Universals' board of directors has ever discussed Amanda's plans for Universal with either Levy or Press, nor have they shared the financial analysis completed by Goldman Sachs with Levy and Press. Amanda argues that by failing to bring these concerns to the attention of Levy and Press, Universal has effectively closed its ears to any thoughts Amanda, Levy or Press may have for overcoming a projected negative cash flow.

By the time of the January 26, 1989 board meeting, Goldman Sachs had completed its analysis of the Kidder Peabody and Chase Manhattan Bank reports used for preparing the financing for the Amanda tender offer. Both Kidder Peabody and Chase Manhattan assumed drastic reductions in capital expenditures and almost a 50 percent reduction in what was described as "headquarters expense." Zimmel informed the board that the Kidder and Chase financial models would necessitate significant changes in Universal's business plans in order to meet the interest and principal payments required by the current financing structure. The financial models reduced capital expenditure dollar amounts to levels below the amount spent in any fiscal year since 1985. To Amanda's credit, Levy and Press testified that those were only models and have not been adopted by them or Amanda. They have no plans for reducing research and development or capi-

tal expenditures budgets and have no plans for changing the operation of Universal.

The highly leveraged nature of the tender offer was and is a concern to the board of directors. Veneman testified that in all his years of experience in the business community he has never seen a financing structure as confusing as the one proposed in Amanda's tender offer. Murray testified that notwithstanding good intentions on the part of Levy and Press, he was of the opinion that the two men would have no choice but to cut research and development and capital expenditures as well as philanthropic activity, all of which represents an integral part of Universal's status as a corporate role model.[10]

Amanda presented the testimony of Professor Nichols, a professor of economics at the University of Wisconsin, Madison. He stated that he had analyzed the operations of HVE since it was purchased by Hyde Park in March 1988, has met with its employees and managers, and talked with Mr. Press. He concluded that based upon his research, Levy and Press and HVE had no plans for Universal which would adversely affect any other constituencies, be they suppliers, customers, or employees of Universal. Professor Nichols' analysis, which may indeed be correct, demonstrates that at best the prospects for Universal's other constituencies, like the other constituencies of HVE are, for *the short term*, not endangered by the Amanda offer. However, simply due to the short period of time (March 1988 through January 1989) which Professor Nichols' research of HVE encompassed, his testimony cannot in any sense overcome the concerns which the Universal board of directors has for Universal's other constituencies in the long run. Universal's business plans extend for several years into the future. While I may or may not have reached the same conclusion as to Amanda's plans for Universal as did the

10. In this later regard Murray testified that Universal is a member of the Greater Milwaukee Initiative and contributes 2 percent of its pretax earnings for charitable purposes. Universal and its managerial executives participate in numerous charitable and community activities such as YMCA, the Boys and Girls Clubs, the University of Wisconsin Milwaukee Foundation, Marquette University, and the National Council of Blindness. Recipients of charitable organizations include the Repertory Theatre, Cardinal Strich College, Alverno College, and a variety of other social agencies.

Universal board, the fact remains that this is a business judgment call not to be second-guessed by this or any other court. The board has the responsibility to exercise its business judgment in accord with the best interests of the shareholders, the company, and the other constituencies.

Amanda contends that in failing to request a formal adequacy opinion from Goldman Sachs, the board acted in an uninformed manner as a matter of law. *Smith v. Van Gorkum,* 488 A.2d 858 (Del. 1985). However, *Smith* involved the sale of the corporation, an entirely different circumstance than is present in this case. In *Smith,* the board acted in a grossly negligent manner in failing to investigate the value of the company, accepting a managing director's recommendation on the price and failing to investigate the offer to determine that the managing director was also interested in the purchasing company. 488 A.2d at 874. In this case, the independent directors ascertained from their own knowledge and experiences that the offer was inadequate in light of the future prospects of the company.

Amanda further challenges the board's actions in failing to negotiate with Amanda, or to do anything other than "just say no" to the offer, such as finding other potential purchasers including a "white knight" or pursuing a management LBO or recapitalization. Universal contends that it is within its prerogatives to reject these other responses to hostile tender offers and to simply remain independent. In the opinion of Universal management, they are not "just saying no", but are instead saying yes—yes to the future prospects of the company. I find no support in the case law that a company must negotiate with a tender offeror. This is especially true where, as here, the offeror has not approached the company prior to commencing the offer and related litigation.

I also disagree with Amanda that *Unocal* and its progeny require a target company, faced with a hostile tender offer, to place itself on the auction block or burden itself with debt in an amount such as would reasonably threaten its continued existence. If faced with a tender offer which the board reasonably believes to be a serious threat to the corporation and its shareholders, then the board should take measures to alleviate that threat.

The *Unocal* court, in describing the threats which may confront a company in a tender offer setting, included, "inadequacy of the price offered, nature and timing of the offer, questions of illegality, the impact on 'constituencies' other than shareholders (i.e., creditors, customers, employees, and perhaps even the community generally), the risk of non-consummation, and the quality of the securities being offered in exchange." 493 A.2d at 955. Amanda argues that no threat is present in this offer because the offer is all cash for all shares and contemplates a back end merger at the same price and consideration shortly after the offer expires. Amanda contends that such an offer is noncoercive and must be allowed to be voted on by the shareholders.

There is an element of coercion or risk even in an all cash, all shares offer such as Amanda's, and this was recognized by the Delaware Chancery Court in *Grand Metropolitan v. The Pillsbury Company,* Case No. 10319, Memo.Op. at 13, 1988 WL 144830 (December 16, 1988) (found at Def. App.Exh. P). In *Pillsbury,* the tender offer retained an escape clause allowing Grand Met to avoid the second-step merger, just as Amanda's does. The *Pillsbury* court noted, and it is borne out in the testimony in this case, that such clauses are commonly used in tender offers, and may even be boilerplate language. Amanda places considerable reliance on *Pillsbury,* since in that case the Chancery Court enjoined Pillsbury's use of its poison pill or rights plan to defeat Grand Met's offer. While the Chancery Court recognized the possibility of risk to the non-tendering shareholders, it did not feel that the risk "as to a 12%/13% minority is so serious as to deprive the holders of the 87% majority of their right to elect whether to accept or reject the Grand Met offer." Mem.Op. at 31. The 87% majority had already tendered their shares to Grand Met and the Pillsbury management was using the pill to

protect its own restructuring plan which (1) did not guarantee an equal or greater value to the shareholders and (2) included the sale of the company in the next three- to five-year period.

Pillsbury is fully distinguishable from this case. Approximately 87% of the shareholders had tendered, compared with at present approximately 27% of the Universal shareholders. Pillsbury had been experiencing a prolonged period of low productivity and decreasing earnings, while Universal is in the midst of now realizing the full potential of its restructuring and has enjoyed both increasing earnings and stock prices. The Universal board reasonably sees a threat to the shareholders who will not tender and also to the shareholders in general, based on the overall timing of the Amanda offer. The shareholders have the potential of reaping the benefits of not only the past successes but the future potential.

The threat relied on by Universal from the outset concerns the adequacy of the offer. The Universal board determined that the initial offer of $30.50 was inadequate, and I do not find that this conclusion was made on an uninformed basis. The board has also determined, even without a formal investment banker's opinion, that the $35.00 offer is inadequate. This conclusion is based on its determination of the future value of the company, market analyses done by Robert W. Baird & Co. and Donaldson, Lufkin & Jenrette, and the market price of the stock. (The Baird study projects a Universal stock price of $37.00—$39.00 in 9–12 months and $45.00—$47.00 in 21–24 months. The Donaldson study projects a better than expected year for Universal in relation to other food and beverage companies. Universal's stock has been trading above or very close to the offer price since the offer was first commenced.) Amanda submitted a Fairness Evaluation from Houlihan, Lokey, Howard & Zukin, Inc. which states that the $35.00 offer price is fair and adequate, to rebut the board's conclusions.

I have already concluded that the board's failure to secure an adequacy opinion was not, under the facts of this case, a breach of its fiduciary duties. Moreover, my decision today does not require that I determine the adequacy of the offer. That is a matter best left to financial professionals, the market forces and the shareholders. The question for the moment is whether the perceived inadequacy of the offer presents a threat of sufficient magnitude to permit the board to continue to block the offer from going to the shareholders in the tender context. Or stated another way, is the poison pill a reasonable response to the threat posed by the inadequacy of the offer or, is it one of those Draconian defenses which cannot be sanctioned?

In *City Capital Associates Limited Partnership v. Interco Inc.*, 551 A.2d 787 (Del.Ch.1988), the court questioned whether a board could forever bar a shareholder choice based on a good-faith belief that the offer was inadequate.

> It would not be surprising or unreasonable to claim that where an offer is not coercive or deceptive (and therefore what is in issue is essentially whether the consideration it offers is attractive or not), a board—even though it may expend corporate funds to arrange alternatives or to inform shareholders of its view of fair value—is not authorized to take preclusive action. By preclusive action, I mean action that, as a practical matter, withdraws from the shareholders the option to choose between the offer and the status quo or some other board sponsored alternative.

551 A.2d at 787. Amanda argues that Universal should not be allowed to do this except possibly in the short term. *See, e.g., MAI Basic Four, Inc. v. Prime Computer, Inc.*, C.A. No. 10428 (Del.Ch. Dec. 20, 1988) (available on West Law, 1988 WL 140221 (Del.Ch.)) (refusing to issue injunction requiring redemption of rights plan due to limited pendency of the offer). Universal argues that it is within the power of the board to manage corporations and if, in its good business judgment, it decides the offer is inadequate, its decision should not be disturbed.

Applying the *Unocal* standards, I am unable to conclude that a board may in

all instances preclude shareholder choice solely on the basis of its own perception of the inadequacy of the offer. If no other threat is posed to the corporation and shareholders, a board must at some point allow shareholders to choose between the offer and some alternative. Whether the alternative is to remain independent and reap the future benefits with the company, as the board proposes here, or a financial restructuring as proposed in *Pillsbury*, or an auction of the company as was done in *Revlon*, the shareholders must at some point be allowed to choose. To do otherwise is to disenfranchise the shareholders.

In the instant case, however, there are other threats in the offer. As noted, there is at this juncture a threat to the nontendering shareholders, who presently constitute the majority. There is also the threat posed by the offer and recognized by the *Interco* court, of a structurally noncoercive offer which contains false or material misleading information. *See* 551 A.2d at 797, n. 10. From the record before me, one might readily conclude that the offer has not passed what might be best described as the "aroma test." The financing is extremely complex, if not convoluted, and lacks the detail one would reasonably expect to find in transactions of this nature. Whether this was deliberate or the product of a hurried effort to get the offer on the table, can only be left to speculation. However, Berisford's role in the offer was not completely disclosed until January 30, 1989 when amendment 13 to Amanda's 14D–1 was filed. Even with amendment 13, there remain questions concerning Berisford's actual control of the offer, and its role after the offer is complete. This is true despite the testimony of Press and Levy that they are the only ones with control of the offer and Universal if the offer is successful.

It is undisputed that during the planning of the offer, Levy and Press were to contribute 1% of the equity investment in return for their management fees and a 1% return on the profits of the Universal deal. Berisford and Resource were to contribute 49.5% of the equity investment in return for a 49.5% share of the profits. On November 28, 1988, three days prior to the offer, Press sent a letter to Resource stating that the deal as planned was unworkable from Berisford's perspective. At that juncture, the present structure took form. Berisford is now contributing 98% of the equity investment and receiving only a 44% stake in the company. Press and Levy, who are now contributing no equity, will get a 56% share of the company, and the sole right to control it. From these facts it comes as no surprise that serious questions concerning the roles of Messr. Press and Levy remain unresolved in the board's mind.

Another threat which exists, and distinguishes this case from either *Interco* or *Pillsbury*, is the threat to the corporation itself. The parties have addressed this as the constituencies issue. I believe it might be more appropriately described as the corporate issue. This threat encompasses not only a danger to a corporation's other constituencies (customers, suppliers, employees) but to the corporation itself. This offer is highly leveraged. In addition, the financial agreements between Levy, Press and the Berisford parties are very unclear in their terms. While the relationship between the various Acquisition Group parties worked for the HVE tender early in 1988, each of the terms was specifically delineated. In the instant offer, no written agreement governs the relationship of the parties. If later disputes arise, the corporation will suffer, both the long-range plans and policies (which Levy and Press want to continue) and the other constituencies (employees and suppliers and customers and communities).

The combination of problems which the board perceived in the offer, and now has a better first-hand knowledge of was a result of this litigation, the board's honest perception that the offer as inadequate, and finally the board's perception that the timing of the offered also offers a threat to corporate policies, and to shareholder return on investment, all offer a significant threat which the board has so far reasonably responded to by refusing to redeem the rights plan. Other courts have approved defensive measures which effectively pre-

cluded shareholder choice on a particular offer. *See, e.g., Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334 (Del. 1987) (upholding the company's facilitation of a "street sweep" by issuance of a dividend and consummation of a new stand still agreement with largest shareholder, all without shareholder approval, as reasonable in light of the threat the coercive, two tiered tender offer posed).

Whether the board's continued refusal to redeem will remain reasonable will depend on facts yet unknown. Amanda may raise its offer price, which may in turn necessitate the board requesting an adequacy opinion. Another offeror may emerge to challenge Amanda and the board's alternative of remaining independent. The Acquisition Group may clear up the ambiguities within its own relationship, and may establish beyond any doubt (through the Federal Reserve Board or the SEC) that the financing is in accord with the margin rules (an issue not reached today). Thus, any number of eventualities may occur, any one of which may require the board to reevaluate its position. However, on the record before me I find no basis to conclude other than that the board has acted in accord with its fiduciary responsibilities in a manner reasonably related to the perceived threat to the corporation, its shareholders, and other constituencies. Amanda's motion for a preliminary injunction requiring redemption of the shareholders rights plan will therefore be denied.

## VII. CONCLUSION

In conclusion then, each of the motions presently before the court will be denied. Universal's motion to enjoin the offer pending a new offer to purchase will be denied because (a) it lacks standing to challenge the alleged margin rule violations, and (b) it has not demonstrated a substantial enough likelihood of success on the merits to overcome the harm which granting such an injunction would cause to Amanda. In addition, I find that Universal will not be irreparably harmed by denying the injunction.

Amanda's motion for injunctive relief under the Williams Act will be denied because the alleged violations upon which Amanda relies are moot and will not support the relief sought. Amanda's motion regarding the statute will be denied, for it neither hinders interstate commerce in violation of the commerce clause nor is preempted by the Williams Act. Finally, Amanda's motion for injunctive relief regarding Universal's use of its shareholders rights plan will be denied because it has not demonstrated a likelihood of success on the issue of the alleged breach of fiduciary duty by the Universal board of directors.

Accordingly,

IT IS ORDERED that Amanda's motion for a preliminary injunction regarding Universal's alleged violations of the securities laws be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that Amanda's motion for injunctive and declaratory relief regarding the Wisconsin Business Combination Act be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that Amanda's motion for a preliminary mandatory injunction requiring redemption of the Universal shareholder rights plan be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that Universal's motion for preliminary injunction enjoining counterclaim defendants' pursuit of the tender offer be and the same is hereby DENIED.

## APPENDIX A

180.726. **Restrictions on certain business combinations involving a resident domestic corporation and interested stockholder**

(1) **Definitions.** In this section:

(a) "Affiliate" has the meaning given in s. 180.725(1).

(b) "Announcement date" means the date of the first public announcement of the final, definitive proposal for a business combination.

(c) "Associate" of a person means any of the following:

1. A corporation or organization of which the person is an officer, director or partner or is the beneficial owner of at least 10% of any class of voting stock.

2. A trust or other estate in which the person has a substantial beneficial interest or as to which the person serves as trustee or in a similar fiduciary capacity.

3. A relative or spouse of the person, or a relative of the spouse, who has the same principal residence as the person.

(d)1. "Beneficial owner" of stock means a person, except as provided in subd. 2, that meets any of the following conditions:

a. Individually, or with or through any of the person's affiliates or associates, beneficially owns the stock, directly or indirectly.

b. Individually, or with or through any of the person's affiliates or associates, directly or indirectly has the right, whether exercisable immediately or only after the passage of time, to acquire the stock pursuant to a written or unwritten agreement, arrangement or understanding or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise.

c. Individually, or with or through any of the person's affiliates or associates, directly or indirectly has the right to vote the stock pursuant to a written or unwritten agreement, arrangement or understanding, except that a person is not the beneficial owner of stock under this subd. 1. c if the agreement, arrangement or understanding to vote that stock arises solely from a revocable proxy or consent given in response to a proxy or consent soliciation made in accordance with the applicable regulations under the exchange act and is not reportable under the report required under 17 CFR 240.13d–1(1)(a) or a comparable or successor report.

d. Has a written or unwritten agreement, arrangement or understanding with another person that is directly or indirectly a beneficial owner, or whose affiliates or associates are direct or indirect beneficial owners, of the stock, if the agreement, arrangement or understanding is for the purpose of acquiring, holding, disposing of or voting the stock, unless the voting is pursuant to a revocable proxy or consent described in subd. 1.c.

2. A person is not the direct or indirect beneficial owner of stock tendered pursuant to a tender or exchange offer which is made by that person or an affiliate or associate of that person until the tendered stock is accepted for purchase or exchange.

(e) "Business combination" means any of the following:

1. A merger, including a merger under s. 180.685, or consolidation of the resident domestic corporation or any subsidiary of the resident domestic corporation with any of the following:

a. An interested stockholder.

b. A corporation, whether or not it is an interested stockholder, which is, or after a merger or consolidation would be, an affiliate or associate of an interested stockholder.

2. A sale, lease, exchange, mortgage, pledge, transfer or other disposition, in one transaction or a series of transactions, to or with an interested stockholder or an affiliate or associate of an interested stockholder of assets of the resident domestic corporation or a subsidiary of the resident domestic corporation if those assets meet any of the following conditions:

a. Have an aggregate market value equal to at least 5% of the aggregate market value of all the assets, determined on a consolidated basis, of the resident domestic corporation.

b. Have an aggregate market value equal to at least 5% of the aggregate market value of all the outstanding stock of the resident domestic corporation.

c. Represent at least 10% of the earning power or income, determined on a consolidated basis, of the resident domestic corporation.

3. The issuance or transfer by the resident domestic corporation or a subsidiary of the resident domestic corporation, in one transaction or a series of transactions, of

any stock of the resident domestic corporation or a subsidiary of the resident domestic corporation if all of the following conditions are satisfied:

a. The stock has an aggregate market value equal to at least 5% of the aggregate market value of all the outstanding stock of the resident domestic corporation.

b. The stock is issued or transferred to an interested stockholder or an affiliate or associate of an interested stockholder, except for stock of the resident domestic corporation or such subsidiary issued or transferred pursuant to the exercise of warrants, rights or options to purchase such stock offered, or a dividend paid, or distribution made, proportionately to all stockholders of the resident domestic corporation.

4. The adoption of a plan or proposal for the liquidation or dissolution of the resident domestic corporation which is proposed by, on behalf of, or pursuant to a written or unwritten agreement, arrangement or understanding with, an interested stockholder or an affiliate or associate of an interested stockholder.

5. Any of the following, if the direct or indirect effect is to increase the proportionate share of the outstanding stock of a class or series or securities convertible into voting stock of the resident domestic corporation or a subsidiary of the resident domestic corporation beneficially owned by the interested stockholder or an affiliate or associate of the interested stockholder, unless the increase is the result of immaterial changes due to fractional share adjustments:

a. A reclassification of securities, including, without limitation, a stock split, stock dividend or other distribution of stock in respect of stock, or reverse stock split.

b. A recapitalization of the resident domestic corporation.

c. A merger or consolidation of the resident domestic corporation with a subsidiary of the resident domestic corporation.

d. Any other transaction, whether or not with, into or involving the interested stockholder, which is proposed by, on behalf of, or pursuant to a written or unwritten agreement, arrangement or understanding with, the interested stockholder or an affiliate or associate of the interested stockholder.

6. Receipt by an interested stockholder or an affiliate or associate of an interested stockholder of the direct or indirect benefit of a loan, advance, guarantee, pledge or other financial assistance or a tax credit or other tax advantage provided by or through the resident domestic corporation or any subsidiary of the resident domestic corporation, unless the interested stockholder receives the benefit proportionately as a holder of stock of the resident domestic corporation.

(g) "Consummation date" means the date of consummation of a business combination.

(h)1. "Control", "controlled by" or "under common control with" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting stock, except as provided in subd. 2, by contract, or otherwise.

2. "Control" of a corporation is not established under subd. 1 if a person, in good faith and not for the purpose of circumventing this section, holds voting power as an agent, bank, broker, nominee, custodian or trustee for one or more beneficial owners who do not individually or as a group have control of that corporation.

(i) "Exchange act" means the securities exchange act of 1934[1] and amendments thereto.

(j)1. "Interested stockholder", with respect to a resident domestic corporation, means a person other than the resident domestic corporation or a subsidiary of the resident domestic corporation that meets any of the following conditions:

a. Is the beneficial owner of at least 10% of the voting power of the outstanding

---

**1.** 15 U.S.C.A. § 78a et seq.

voting stock of that resident domestic corporation.

b. Is an affiliate or associate of that resident domestic corporation and at any time within 3 years immediately before the date in question was the beneficial owner of at least 10% of the voting power of the then outstanding voting stock of that resident domestic corporation.

2. For the purpose of determining whether a person is an interested stockholder, the number of shares of voting stock of the resident domestic corporation considered outstanding includes shares beneficially owned by the person but does not include any other unissued shares of voting stock of the resident domestic corporation which may be issuable pursuant to an agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise.

(1)1. "Resident domestic corporation" means a domestic corporation that, as of the stock acquisition date in question, satisfies any of the following:

a. Its principal executive offices are located in this state.

b. It has significant business operations located in this state.

c. More than 10% of the holders of record of its shares are residents of this state.

d. More than 10% of its shares are held of record by residents of this state.

2. For purposes of subd. 1.c and d, the record date for determining the percentages and numbers of shareholders and shares is the most recent shareholder record date established under s. 180.26 before the stock acquisition date in question, and the residence of each shareholder is the address of the shareholder which appear on the records of the resident domestic corporation.

(m) "Stock" means any of the following:

1. Shares, stock or similar security, certificate of interest, participation in a profit sharing agreement, voting trust certificate, or certificate of deposit for any of the items described in this subdivision.

2. Security which is convertible, with or without consideration, into stock, or any warrant, call or other option or privilege of buying stock, or any other security carrying a right to acquire, subscribe to or purchase stock.

(n) "Stock acquisition date", with respect to any person, means the date that that person first becomes an interested stockholder of that resident domestic corporation.

(o) "Subsidiary" of a resident domestic corporation means any other corporation, whether or not a domestic corporation, of which voting stock having a majority of the votes entitled to be cast is owned, directly or indirectly, by the resident domestic corporation.

(p) "Voting stock" means capital stock of a corporation, whether or not a domestic corporation, entitled to vote generally in the election of directors.

**(2) Business combinations during the 3 years after the stock acquisition date.** Except as provided in sub. (5), a resident domestic corporation may not engage in a business combination with an interested stockholder of the resident domestic corporation for 3 years after the interested stockholder's stock acquisition date unless the board of directors of the resident domestic corporation has approved, before the interested stockholder's stock acquisition date, that business combination or the purchase of stock made by the interested stockholder on that stock acquisition date.

**(3) Business combinations more than 3 years after the stock acquisition date.** At any time after the 3-year period described in sub. (2), the resident domestic corporation may engage in a business combination with the interested stockholder but only if any of the following is satisfied:

(a) The board of directors of the resident domestic corporation has approved, before the interested stockholder's stock acquisition date, the purchase of stock made by the interested stockholder on that stock acquisition date.

(b) The business combination is approved by the affirmative vote of the holders of a

majority of the voting stock not beneficially owned by the interested stockholder at a meeting called for that purpose.

(c) The business combination meets all of the following conditions:

1. Holders of all outstanding shares of stock of the resident domestic corporation not beneficially owned by the interested stockholder are each entitled to receive per share an aggregate amount of cash and the market value, as of the consummation date, of noncash consideration at least equal to the higher of the following:

a. The highest of: the market value per share on the announcement date with respect to the business combination, the market value per share on the interested stockholder's stock acquisition date, the highest price per share paid by the interested stockholder, including brokerage commissions, transfer taxes and soliciting dealers' fees, for shares of the same class or series within the 3 years immediately before and including the announcement date of the business combination, or the highest price per share paid by the interested stockholder, including brokerage commissions, transfer taxes and soliciting dealers' fees, for shares of the same class or series within the 3 years immediately before and including the interested stockholder's stock acquisition date; plus, in each case, interest compounded annually from the earliest date on which that highest per share acquisition price was paid or the per share market value was determined, through the consummation date, at the rate for one-year U.S. treasury obligations from time to time in effect; less the aggregate amount of any cash and the market value, as of the dividend payment date, of any noncash dividends paid per share since that date, up to the amount of that interest.

b. The highest preferential amount per share, if any, to which the holders of shares of that class or series of stock are entitled upon the voluntary or involuntary liquidation of the resident domestic corporation, plus the aggregate amount of dividends declared or due which those holders are entitled to before payment of dividends on another class or series of stock, unless the aggregate amount of those dividends is included in the preferential amount.

2. The form of consideration to be received by holders of each particular class or series of outstanding stock in the business combination is in cash or, if the interested stockholder previously acquired shares of that class or series, the same form as the interested stockholder previously used to acquire the largest number of shares of that class or series.

(d) The business combination is a business combination as described in sub. (5)(a), (b), (c), (d) or (e).

**(4) Determination of market value.** For purposes of this section, the market value of stock or property other than cash or stock is determined as follows:

(a) In the case of stock by:

1. The highest closing sale price during the 30 days immediately before the date in question of a share of that class or series of stock on the composite tape for stocks listed on the New York stock exchange, or, if that class or series of stock is not quoted on the composite tape or if that class or series of stock is not listed on the New York stock exchange, on the principal U.S. securities exchange registered under the exchange act on which that class or series of stock is listed.

2. If that class or series of stock is not listed on an exchange described in subd. 1, the highest closing bid quotation for a share of that class or series of stock during the 30 days immediately before the date in question on the national association of securities dealers automated quotation system, or any similar system then in use.

3. If no quotations described in subd. 2 are available, the fair market value on the date in question of a share of that class or series of stock as determined in good faith by the board of directors of the resident domestic corporation.

(b) In the case of property other than cash or stock, the fair market value of the property on the date in question as determined in good faith by the board of directors of the resident domestic corporation.

**(4m) Presumption of control.** For purposes of this section, a person's beneficial ownership of at least 10% of the voting power of corporation's outstanding voting stock creates a presumption that the person has control of the corporation.

**(5) Exclusions from section.** This section does not apply to any of the following:

a. Unless the articles of incorporation provide otherwise, a business combination of a resident domestic corporation with an interested stockholder if the resident domestic corporation did not have a class of voting stock registered or traded on a national securities exchange or registered under section 12(g) of the exchange act on the interested stockholder's stock acquisition date.

b. Unless the articles of incorporation provide otherwise, a business combination with an interested stockholder who was an interested stockholder immediately before September 10, 1987, unless subsequently the interested stockholder increased its beneficial ownership of the voting power of the outstanding voting stock of the resident domestic corporation to a proportion in excess of the proportion of voting power that the interested stockholder beneficially owned immediately before September 10, 1987, excluding an increase approved by the board of directors of the resident domestic corporation before the increase occurred.

c. A business combination of a resident domestic corporation with an interested stockholder which became an interested stockholder inadvertently, if the interested stockholder satisfies all of the following:

1. As soon as practicable divests itself of a sufficient amount of the voting stock of the resident domestic corporation so that the interested stockholder is no longer the beneficial owner of at least 10% of the voting power of the outstanding voting stock of the resident domestic corporation, or a subsidiary of that resident domestic corporation.

2. Would not at any time within the 3 years before the announcement date with respect to the business combination in question have been an interested stockholder except for the inadvertent acquisition.

(d) A business combination of a resident domestic corporation with an interested stockholder which was an interested stockholder immediately before September 10, 1987, and inadvertently increased its beneficial ownership of the voting power of the outstanding voting stock of the resident domestic corporation to a proportion in excess of the proportion of voting power that the interested stockholder beneficially owned immediately before September 10, 1987, if the interested stockholder divests itself of a sufficient amount of voting stock so that the interested stockholder is no longer the beneficial owner of a proportion of the voting power in excess of the proportion of voting power that the interested stockholder held immediately before September 10, 1987.

(e) A business combination of a resident domestic corporation if the business combination is governed by s. 180.04(6), with respect to acquiring or holding stock of a state bank or trust company, or by s. 186.-31, 186.41, 215.36, 215.53, 215.73, 221.25, 221.58 or 223.11.

**(6) Relationship of section to other laws.** (a) The requirements of this section are in addition to the requirements of other applicable law, including the other provisions of this chapter, and any additional requirements contained in the articles of incorporation or bylaws of a resident domestic corporation with respect to business combinations.

(b) For purposes of applying this section, if any other provision of this chapter is inconsistent with, in conflict with or contrary to this section, that provision does not apply to the extent that it is inconsistent with, in conflict with or contrary to this section.

**(7) Sunset.** This section does not apply after September 10, 1991.

1022

APPENDIX B

* Mr. Horwitch recently left the employ of High Voltage and agreed to sell his stock back to High Voltage.